# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

IN THE MATTER OF THE SEARCH OF:

THE RESIDENCE LOCATED AT 505 17TH AVENUE NE, WATFORD CITY, NORTH DAKOTA, TO INCLUDE ANY AND ALL OUTBUILDINGS AND VEHICLES CONTAINED UPON THE PROPERTY.

**SEARCH WARRANT**

4:14-mj-04

TO:   U.S. Postal Inspector Thomas D. Irvin, and any Authorized Officer of the United States

Affidavit(s) having been made before me by Inspector Thomas D. Irvin, USPIS, who has reason to believe that on the property known as,

### SEE ATTACHMENT A

in the District of North Dakota, there is now concealed a certain property,

### SEE ATTACHMENT B

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is now concealed on the premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before

_January 27, 2014_   (not to exceed 14 days) the place named above for the property specified, serving this warrant and making the search in the daytime - 6:00 a.m. to 10:00 p.m. - and if the property be found there to seize same, leaving a copy of this warrant and receipt for the property taken, and prepare a written inventory of the property seized and promptly return this warrant to Magistrate Judge Charles S. Miller, Jr., as required by law. Upon information provided in the Affidavit of Probable Cause a no-knock entry into the residence is authorized by the Court.

1/13/2014 at 9:40 a.m.           at Bismarck, North Dakota
Date and Time Issued                              City and State

CHARLES S. MILLER, JR., Magistrate Judge
United States District Court
Name and Title of Judicial Officer                  Signature of Judicial Officer

EX #1

## ADDENDUM TO SEARCH WARRANT
## RE ELECTRONIC DEVICES, MEDIA, AND STORED INFORMATION

The following requirements shall apply to any (i) computer, printer, plotter, scanner, cell phone, camera, or other like electronic device capable of creating, displaying, transmitting, manipulating or storing electronic data ("Electronic Device"), (ii) any tapes, drives, cards, and other media capable of storing electronic data ("Storage Media"), and (iii) Electronically Stored Information seized pursuant to this warrant:

1. Electronic Devices, Storage Media, and Electronically Stored Information *seized* pursuant to this warrant are subject to *search* only for the Electronically Stored Information that is specifically described in and that is the subject of this warrant.

2. The search of any Electronic Device, Storage Media, or Electronically Stored Information authorized by this warrant shall be completed within $70$ days from the date of the warrant unless, for good cause demonstrated, such date is extended by order of the court.

3. Upon request of the owner, the government shall promptly provide a copy of any Electronically Stored Information on any seized Electronic Device or Storage Media unless the stored information is contraband or instrumentality of a crime or unless the government obtains an order from the court stating that a copy need not be provided.

4. Upon completion of the search, any seized Electronic Device or Storage Media shall be promptly returned to the owner unless the Device or Media, or it contents, is contraband or instrumentality of a crime, unless the government obtains an order from the court stating it need not be returned or unless the Federal Rules of Criminal Procedure authorize its retention.

5. Following the completion of the search authorized by this warrant, the government may not without first obtaining a court order use any retained Electronically Stored Information that is not the subject of the warrant for any purpose other than verifying the authenticity or the integrity of Electronically Stored Information that is the subject of the warrant. In addition, nothing in this warrant authorizes the government to retain any Electronically Stored Information that is not the subject of the warrant after any legitimate law enforcement purpose has ended with respect to Electronically Stored Information that is the subject of the warrant, except as otherwise permitted by the Federal Rules of Criminal Procedure.

6. Nothing in this warrant shall limit or prevent the government from seizing any Electronic Device, Storage Media, or Electronically Stored Information as contraband or instrumentality of a crime and commencing forfeiture proceedings against such property.

7. The government, the owner of the seized property, and/or the person from whom the property was seized may motion the court at any time for appropriate relief in the event of a dispute over the ownership, retention, or return of any Electronic Device, Storage Media, or Electronically Stored Information seized pursuant to this warrant, and the court retains jurisdiction to consider any such motions.

00041

### Attachment A

#### Description – Single Family Residence located at
#### 505 17th Ave NE, Watford City, ND 58854

Image 1



505 17th Ave NE, Watford City 58854, is a single family home located on the south side of 17th Ave NE approximately 800 feet east of County Rd 33 in McKenzie County, ND. The home is a brown/green colored rambler with light colored trim and two light colored garage doors. The garage doors face west and are attached to structure. This location includes any/all vehicles, trailers, recreational vehicles, and/or outbuildings located on the property, as illustrated in 'Image 2'.

Image 2



## ATTACHMENT B
## ITEMS TO BE SEIZED

a.  Computer input and output devices including but not limited to keyboards, mice, scanners, printers, monitors, network communication devices, modems and external or connected devices used for accessing computer storage media.

b.  Electronic storage media and digital content including but not limited to floppy disks, hard drives, tapes, DVD disks, CD-ROM disks, flash drives or other magnetic, optical or mechanical storage which can be accessed by computers to store or retrieve data.

c.  Computer software and application software installation and operation media.

d.  Items or files containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized.

e.  Correspondence, billings, receipts, bank statements, credit accounts, credit card numbers, wires, stock and share certificates, tax forms or other documents (whether digital or written) pertaining to the operation of Blackstone LLC, Blackstone Crude LLC, Blackstone Building Group LLC, Blackwell Services LLC, Blackstone Oilfield Services LLC and any other, as of yet, undiscovered company or LLC owned, operated or managed by JAMES TERRY HENRIKSON and/or SARAH CREVELING and/or any alias or variation referenced in the affidavit such as JAMES TERRY HENRICKSON, JAMES TERRY HENDERSON, JAMES TERRY HENDRIKSEN, JAMES TERRY HENDRIKSON, JAMES TERRY HENRICKSEN, JAMES TERRY HENRIKSEN, COLE JOHNSON, and AMY PETERSON.

f.  Records reflecting names, addresses, and/or telephone numbers of any or all persons who were or are employees, officers, agents or independent contractors of BLACKSTONE LLC, BLACKSTONE CRUDE LLC, BLACKSTONE BUILDING GROUP LLC, BLACKWELL SERVICES LLC, and BLACKSTONE OILFIELD SERVICES LLC and any other, as of yet, undiscovered company or LLC owned, operated or managed by JAMES TERRY HENRIKSON and/or SARAH CREVELING.

g.  Address and/or telephone books, rolodex indices, and any papers or correspondence, reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, financial institutions, and other individuals or businesses with whom a financial relationship exists with BLACKSTONE LLC, BLACKSTONE CRUDE LLC, BLACKSTONE BUILDING GROUP LLC, BLACKWELL SERVICES LLC, and BLACKSTONE OILFIELD SERVICES LLC

h.  Cellular telephones, smartphones, or any other mobile communication or digital data storage device for information related to the operation of Blackstone LLC, Blackstone Crude LLC, Blackstone Building Group LLC, Blackwell Services LLC, Blackstone Oilfield Services LLC and any other, as of yet, undiscovered company or LLC owned, operated or managed by JAMES TERRY HENRIKSON and/or SARAH CREVELING, and/or any alias or variation referenced in the affidavit such as JAMES TERRY HENRICKSON, JAMES TERRY HENDERSON, JAMES TERRY HENDRIKSEN, JAMES TERRY HENDRIKSON, JAMES TERRY HENRICKSEN, JAMES TERRY HENRIKSEN, COLE JOHNSON, and AMY

PETERSON.

i.  Cellular telephones, smartphones, or any other mobile communication or digital data storage device for information recording JAMES TERRY HENRIKSON'S or SARAH CREVELING'S schedule or travel from February 2011 to the present.

j.  Items that would tend to establish, and identify, ownership of the residence, vehicles, storage facilities, cellular phones, cellular phone services, or computers to include credit card bills, telephone bills, correspondence and other identification documents.

k.  Any and all US currency exceeding $1,000.

l.  Firearms and ammunition.

m.  Items that would tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

IN THE MATTER OF THE SEARCH OF:

THE RESIDENCE LOCATED AT 505 17TH
AVENUE NE, WATFORD CITY, NORTH
DAKOTA, TO INCLUDE ANY AND ALL
OUTBUILDINGS AND VEHICLES
CONTAINED UPON THE PROPERTY.

4:14-mj-04

**APPLICATION AND
AFFIDAVIT FOR
SEARCH WARRANT**

I, U.S. Postal Inspector Thomas D. Irvin, being duly sworn depose and say:

I am United States Postal Inspector Thomas D. Irvin with the United States Postal
Inspection Service, assigned to the Denver Division, and have reason to believe that on the
property known as;

### SEE ATTACHMENT A

in the District of North Dakota, there is now concealed a certain property, namely,

### SEE ATTACHMENT B

which is property that constitutes evidence of the commission of a criminal offense; and/or
contraband, the fruits of crime or things otherwise criminally possessed; and/or property
designed or intended for use or which is or has been used as a means of committing a
criminal offense,

concerning a violation(s) of Title 18, United States Code, Sections 922(g), 1341, 1343,
1956 and 1957.

The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT OF INSPECTOR THOMAS IRVIN

USPIS THOMAS D. IRVIN

Subscribed and sworn to before me this 13th day of January, 2014.

CHARLES S. MILLER, JR., Magistrate Judge
United States District Court

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NORTH DAKOTA

IN THE MATTER OF THE SEARCH )          CRIM. NO. 4:14- mj-04
OF 505 17ᵀᴴ AVENUE NE            )
WATFORD CITY, ND 58854          )

APPLICATION AND AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, U.S. Postal Inspector Thomas Irvin, being duly sworn, depose and state as follows:

**INTRODUCTION**

1.  I have been a U.S. Postal Inspector with the United States Postal Inspection
    Service (USPIS) since July 2005, and I am currently assigned to a multi
    purpose team, assigned to the Denver Division. As part of my duties as a U.S.
    Postal Inspector, I investigate crimes against the U.S. Postal Service (USPS)
    and crimes furthered through the use of the U.S. Mail.  As part of this
    assignment, I received formal training from the U.S. Postal Inspection Service
    and training through contact with experts from various law enforcement
    agencies.  I have received extensive training in criminal investigative
    procedures, and the enforcement of federal laws.  I have conducted numerous
    criminal financial crime investigations that have included Mail Fraud, Wire
    Fraud, Bank Fraud, Money Laundering, Credit Card Fraud, and additional
    schemes.

2.  This affidavit is being submitted in support of an application for a search
    warrant to obtain evidence of violations of Title 18, United States Code,
    Section 1341 (Mail Fraud), Title 18, United States Code, Section 1343 (Wire
    Fraud), Title 18 United States Code, 1956 and 1957 (Money Laundering), and
    Title 18 United States Code, 922(g)(1).  This affidavit is also being submitted
    for the purpose of initiating a civil forfeiture action against certain assets that
    represent proceeds and facilitating property of the below identified crimes.

1

Finally, this affidavit is being submitted to obtain a seizure warrant and protective orders to preserve forfeitable assets (the forfeitability of which will be established below) pending the outcome of the civil action and any action that is subsequently initiated. Because this affidavit is being submitted for these limited purposes, I have not included each and every fact known concerning this investigation. I have set forth only the facts believed necessary to establish probable cause and to provide a factual basis for preserving seizure, and forfeiture of assets. Where statements of others are set forth in this affidavit, they are set forth in substance and are not verbatim. The information contained in this affidavit is based on my own personal knowledge and information gained through training and experience, in addition to information obtained by other law enforcement agents, witnesses and documents.

3. As set forth elsewhere in this affidavit, the premise(s) to be searched is a residential house located at **505 17th Avenue NE, Watford City, ND 58854,** **(505 17th Avenue NE),** to include the garage, and any and all outbuildings located on the same property, as well as any and all vehicles/recreational vehicles located in or on the property, as described in further detail in **Attachment A.** There is probable cause to believe that this residential house, as well as certain other property, vehicles, assets, and bank accounts, constitute proceeds of Mail and/or Wire Fraud, as well as facilitating property of such crimes, and are therefore subject to seizure pursuant to Title 18, United States Code Section 981(b)(1).

4. As is described more fully in this affidavit, based on a joint agency investigation conducted by the North Dakota Bureau of Criminal Investigation (BCI), Homeland Security Investigations (HSI), Internal Revenue Service Criminal Investigations (IRS CI), and USPIS, there is probable cause to believe that individuals at **505 17th Avenue NE,** have and are, committing

2

violations of Mail Fraud, Wire Fraud, Money Laundering and Felon in Possession of Firearms. Furthermore, there is probable cause to believe that evidence, fruits, and instrumentalities of these offenses (as described in **Attachment B**) will be found at **505 17th Avenue NE** or located on the property (as described in **Attachment A, Image 2**).

## LEGAL BACKGROUND

5. Title 18, United States Code, Section 1341, provides in pertinent part: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, places in any post office, or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives there from, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

6. Title 18, United States Code, Section 1343, provides in pertinent part: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

7. Title 18, United States Code, Section 1957, provides in pertinent part: Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived

property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished for an offense under this is a fine under Title 18, United States Code, or imprisonment for not more than 10 years or both.

8. Title 18, United States Code, Section 922(g), provides in pertinent part: It shall be unlawful for any person who has been convicted in any court, of, a crime punishable by imprisonment for a term exceeding one year, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

**DETAILS OF PROBABLE CAUSE FOR SEARCH AND SEIZURE WARRANT**

**SUMMARY OF SCHEME**

9. As outlined below, this investigation has revealed that from on or about February 2011 through on or about present date, JAMES TERRY HENRIKSON, AKA "JAMES TERRY HENRICKSON", AKA "JAMES TERRY HENDERSON", AKA "JAMES TERRY HENDRIKSEN", AKA "JAMES TERRY HENDRIKSON", AKA "JAMES TERRY HENRICKSEN", AKA "JAMES TERRY HENRIKSEN", AKA "COLE JOHNSON" along with his wife, SARAH CREVELING, AKA "SARAH HENDRICKSON", AKA "AMY PETERSON", have executed a scheme to defraud various investors and individuals in North Dakota, Texas, Florida, and elsewhere. HENRIKSON, while purporting to be the owner, manager, and/or director of BLACKSTONE LLC, BLACKSTONE CRUDE LLC, BLACKSTONE BUILDING GROUP LLC, BLACKWELL SERVICES LLC, and BLACKSTONE OILFIELD SERVICES LLC, or any variation thereof, solicited or caused to be solicited, individuals to invest money for the

4

purposes of starting and operating an oil field trucking business.
HENRIKSON and CREVELING misrepresented and concealed
HENRIKSON'S true identity as well as profits made by BLACKSTONE LLC
and other entities which they owned and operated.

10. As detailed throughout this affidavit, HENRIKSON and CREVELING falsely
represented to investors that BLACKSTONE LLC was owned and operated by
HENRIKSON.  HENRIKSON and CREVELING initially used investor's
money to purchase equipment and operate BLACKSTONE LLC.
HENRICKSON and CREVELING concealed and misrepresented financial
profits made by BLACKSTONE LLC and misrepresented to investors that
BLACKSTONE LLC was not profitable.  Unknown to the individual
investors, HENRIKSON and CREVELING developed additional side
business entities, by utilizing BLACKSTONE LLC equipment and assets.
HENRIKSON and CREVELING further transferred or converted
BLACKSTONE LLC assets/funds to themselves or entities which they
owned/controlled.  Furthermore, HENRIKSON and CREVELING caused
BLACKSTONE LLC to incur expenses for the side entities
established/controlled by HENRIKSON and CREVELING.

11. HENRIKSON and CREVELING directed work loads away from
BLACKSTONE LLC and caused increased profits for their side business
entities, resulting in decreased profits for BLACKSTONE LLC and individual
investors.  HENRIKSON and CREVELING defrauded individual investors
from future Returns on Investment (ROI) from profits made by
BLACKSTONE LLC and other business entities developed by HENRIKSON
and CREVELING.  HENRIKSON and CREVELING caused late or missed
investor payments.  HENRIKSON and CREVELING repeatedly made excuses
with investors and continually claimed something was impeding their ability
to pay.

12. As further explained throughout this affidavit, and as part of the scheme, investors submitted money to HENRIKSON and CREVELING via wire transfers and other means. Furthermore, investors received business proposals from HENRIKSON and CREVELING via email. HENRIKSON and CREVELING caused financial profit statements detailing the financial status of BLACKSTONE LLC, to be sent to individual investors via the U.S. Mail and/or other commercial carrier, i.e. Fedex, and those financial statements misrepresented the financial status of BLACKSTONE LLC and other business entities.

13. As established throughout this affidavit, witnesses and investors have met with HENRIKSON and CREVELING at 505 17th Avenue NE. Law enforcement involved in this investigation has conducted surveillance and met with HENRIKSON and CREVELING at 505 17th Avenue NE. Through a review of public record databases and USPS records, CREVELING is listed as the owner of 505 17th Avenue NE, and mail is currently being forwarded to this residence in the names of HENRIKSON, CREVELING, and the various business entities.

**BANKRUPTCY/CIVIL CASE INFORMATION**

14. As part of the scheme detailed throughout this affidavit, paragraph 13, 14, and 15, discuss significant background information concerning HENRIKSON and a similar scheme that he has have been publicly alleged to have previously executed. This information is being included because, as explained below, there is probable cause to believe that HENRIKSON provided false names and spellings of his actual name to investors to cloak his prior criminal background and the prior allegations of business fraud. A review of the published alleged facts of this case revealed a similar fraud scheme as

6

referenced throughout this affidavit. The information contained in paragraphs 13, 14 and 15, is a summary of court records obtained from the United States District Court for the District of Oregon, Case No. CV01639-HA as well as records obtained from United States Bankruptcy Court for the Eastern District of Washington, Case No. 08-00280.

15. On or about November 14, 2006, Masonry Industry Trust Administration, an Oregon Corporation, filed a civil lawsuit against Accent Masonry LLC, Greystone Masonry LLC, Stacey Firth (Stacey Henrikson, former spouse), and JAMES HENRIKSON. The lawsuit alleged the above named individuals/entities failed to make contributions to the Masonry Industry Funds. The fund accepts and administers contributions from employers for health and welfare etc., and are comprised of pension trust funds. On June 20, 2008, Judgment's were ordered against Accent Masonry LLC and Greystone Masonry LLC. On or about January 28, 2008, HENRIKSON and former spouse Firth, filed for bankruptcy in the Eastern District of Washington. Due to the bankruptcy filing, the civil case against HENRIKSON was stayed pending resolution of the bankruptcy case. Following the resolution of the bankruptcy case, a judgment was entered against Firth and the case against HENRIKSON is pending.

16. On or about January 28, 2008, HENRIKSON and Firth filed a voluntary chapter 11 bankruptcy petition in the Eastern District of Washington. The case was converted to chapter 7 and a trustee was appointed. A review of the alleged facts of this case revealed an allegation of a similar fraud scheme as referenced throughout this affidavit. Through a review of these court records it was alleged and stated by the trustee that HENRIKSON and Firth operated businesses through LLCs owned solely in the name of Firth and the assets used in the businesses were used by both HENRIKSON and Firth for personal and business purposes. The appointed trustee alleged HENRIKSON failed to

7

disclose assets, testified falsely under oath, transferred assets without court authority, transferred assets through the use of several business entities (LLC), transferred cash assets between various entities, failed to list loans made to their companies or all debts owed by their companies, and commingled assets personally and among the various business entities. On December 4, 2009 Bankruptcy Judge Frank L. Kurtz entered an order striking the debtor's answer and denying the debtor's discharge.

## BACKGROUND INFORMATION

17. Your affiant and other law enforcement involved in this investigation received information from the Social Security Administration (SSA) and learned that JAMES TERRY HENRIKSON, DOB: XX/XX/1979, is associated with Social Security Number (SSN) XXX-XX-5776. SSA had no further records with this SSN being associated with any other name or name variation. A review of North Dakota driver's license records revealed that HENRIKSON has a valid North Dakota license and lists a residential address of 1940 S. Broadway PMB 154, Minot, ND 58701. Further review of North Dakota driver's license records revealed that SARAH MARIE CREVELING, DOB: XX/XX/1986, SSN: XXX-XX-2147, also lists a residential address of 1940 S. Broadway, PMB 154, Minot, ND 58701. Your affiant obtained and reviewed court records for case 12-2-1331-5 in the Superior Court for the State of Washington, Pierce County. As part of this case both CREVELING and HENRIKSON prepared written declarations stating they were married on August 16, 2011.

18. Your affiant and other law enforcement reviewed Texas Secretary of State's (TSOS) records and determined BLACKSTONE LLC was a Texas based company with an initial filing date of February 23, 2011. CREVELING was listed as the registered agent for BLACKSTONE LLC with an address of 7301

RR 620 N. Suite 155-154, Austin, TX 78726. Records obtained from North Dakota Job Service, indicate that BLACKSTONE BUILDING GROUP LLC, DBA BLACKSTONE LLC, is 100% owned by SARAH CREVELING. Job Service records list an address for both business entities of 1940 S. Broadway PMB 154, Minot, ND.

19. Your affiant and other law enforcement obtained a copy of a Texas Secretary of State filing prepared by SARAH CREVELING. On July 13, 2011, an "Assumed Name Records Certificate of Ownership for Unincorporated Business" was filed with the Travis County Clerk in Austin, TX. The record was signed in the name of SARAH CREVELING on behalf of BLACKSTONE BUILDING GROUP LLC. The form certified that CREVELING and BLACKSTONE BUILDING GROUP LLC were the owners of BLACKSTONE LLC. Furthermore, information obtained through interviews, and discussed throughout this affidavit, indicate BLACKSTONE LLC and BLACKSTONE BUILDING GROUP LLC operated as the same entity.

20. Your affiant and other law enforcement obtained and reviewed records from litigation between BLACKSTONE LLC, HENRIKSON, CREVELING, and individual investors, as also referenced paragraphs 20, 21, 22, and 23. Certain records purport to be copies of federal tax returns for BLACKSTONE BUILDING GROUP LLC. These records were obtained by INVESTOR 1 and his attorney through attorneys and accountants working with BLACKSTONE LLC. These records indicate BLACKSTONE BUILDING GROUP LLC was incorporated on February 23, 2011, and has been voluntarily dissolved. These records identified CREVELING as the sole shareholder and registered agent. The listed business address is 1940 S. Broadway, PMB 154, Minot, ND.

21. Your affiant and other law enforcement obtained and reviewed copies of records obtained through litigation between BLACKSTONE LLC, HENRIKSON, CREVELING, and individual investors of BLACKSTONE LLC, purporting to be federal tax returns, as well as records from the North Dakota Secretary of State (NDSOS), for BLACKWELL SERVICES LLC. NDSOS records indicate BLACKWELL SERVICES LLC was dissolved voluntarily on May 31, 2013. BLACKWELL SERVICES LLC was incorporated on November 30, 2011, as a trucking business. CREVELING is listed as the president with a principal office at 1940 S. Broadway, PMB 154, Minot, ND 58701.

22. Your affiant and other law enforcement obtained and reviewed copies of records obtained through litigation between BLACKSTONE LLC, HENRIKSON, CREVELING, and individual investors, purporting to be federal tax returns, as well as records from NDSOS, for BLACKSTONE CRUDE LLC. These records indicate BLACKSTONE CRUDE LLC is active and in good standing. BLACKSTONE CRUDE LLC was incorporated on November 28, 2011, as a crude oil hauling business. CREVELING is listed as the registered agent with a principal office at 1940 S. Broadway, PMB 154, Minot, ND 58701.

23. Your affiant and other law enforcement obtained and reviewed copies of records obtained through litigation between BLACKSTONE LLC, HENRIKSON, CREVELING, and individual investors, purporting to be federal tax returns for BLACKSTONE OILFIELD SERVICES LLC. The records indicate BLACKSTONE OILFIELD SERVICES LLC was incorporated on November 1, 2011, with a listed address of 1940 S. Broadway, PMB 154, Minot, ND 58701, and operated as a trucking business. Stephanie Welmaker listed as the sole shareholder.

24. Your affiant and other law enforcement obtained and reviewed criminal history information for HENRIKSON and identified several arrest and prosecution records for the states of Oregon, Washington, Texas, and North Dakota. Criminal History records identified the following felony convictions for HENRIKSON: February 3, 2011, Unlawful Manufacture of Marijuana, Deshutes County; June 17, 2002, Attempting to Elude Police, Deschutes County, November 26, 2011, 2nd Degree Burglary, Deschutes County; October 16, 2011, Attempt to Commit Crime-Assault II, Deschutes County, October 16, 2001, Theft 1st Degree (3 Counts), Deschutes County.

25. Your affiant and other law enforcement have reviewed various documents, mailing records, and LLC filings and registrations that indicate HENRICKSON and CREVELING have been/are using the address of 1940 S. Broadway PMB (Private Mail Box) 154, Minot, ND 58701, as part of the scheme. This physical address is that of a Commercial Mail Receiving Agency (CMRA), i.e. a UPS Store. Identification of the United States Postal Service's (USPS) "Application of Delivery of Mail Through Agent (PS Form 1583)" form indicates that SARAH CREVELING leased PMB 154 beginning on July 21, 2011.

26. The owner/operator of the CMRA and PS Form 1583 identified the following names/entities that were/are authorized to receive mail at PMB 154: SARAH CREVELING, SARAH MACKEY, JAMES HENRIKSON, SARAH HENDRICKSON, NIKKI DZIEDZIC, BLACKWELL SERVICES LLC, BLACKSTONE BUILDING GROUP LLC, BLACKSTONE CRUDE LLC, BLACKSTONE LLC, BLACKSTONE, MAHESHU ENERGY LLC, and GENEVA WORLD INVESTMENTS. A review of the CMRA records as well as information from the CMRA owner/operator revealed that CREVELING provided Mail Forwarding instructions and that mail has been forwarded from the CMRA to 505 17th Avenue NE. The CMRA forwarding

11

instruction records identify the mail will be forwarded on a "will call" basis. CMRA records revealed that mail for PMB 154 has been forwarded approximately 1 to 2 times per month with the last forwarding dates of November 4, 2013 and December 4, 2013. Furthermore, as of December 27, 2013, your affiant has verified through mailing records that correspondence in the names of BLACKSTONE LLC, BLACKSTONE CRUDE LLC, JAMES HENRIKSON, SARAH CREVELING, and BLACKSTONE BUILDING GROUP LLC have been delivered to PMB 154 and are available for pickup and/or forwarding.

### INVESTOR 1

27. On various dates, law enforcement involved in this investigation interviewed and received documents and information from various individual investors, including INVESTOR 1. The information detailed in paragraphs 27 through 49, and as otherwise stated, was provided by INVESTOR 1. Beginning in June of 2011, INVESTOR 1 met HENRIKSON and CREVELING and began negotiations about starting a trucking company in North Dakota.

28. HENRIKSON represented to INVESTOR 1 that he was the owner of BLACKSTONE LLC and authorized to make decisions for BLACKSTONE LLC. During the initial stages of negotiating the business concept with HENRIKSON and CREVELING, HENRIKSON provided INVESTOR 1 with a false spelling/name for HENRIKSON (specifically: "JAMES HENRICKSEN"). HENRIKSON also used the false name to sign the business documents and legal contracts with INVESTOR 1 and BLACKSTONE LLC. Your affiant has confirmed HENRIKSON'S use of a false name through the review of the joint venture contract between INVESTOR 1 and HENRIKSON, which was signed in the name of "JAMES HENRICKSEN." Relying on the information provided by HENRIKSON,

INVESTOR 1 attempted to perform a background check and was unable to locate any derogatory information about "JAMES HENRICKSEN." Based on the representations made by HENRIKSON, and the lack of any "red flag" information when INVESTOR 1 attempted to perform due diligence on his soon-to-be business partner, INVESTOR 1 invested in the business venture and wire transferred investment funds to BLACKSTONE LLC.

29. INVESTOR 1 stated he worked with HENRIKSON and CREVELING to prepare a resume for additional investors, on behalf of HENRIKSON. INVESTOR 1 prepared the resume using information obtained through telephonic conversations with HENRIKSON. Based on representations made by HENRIKSON, INVESTOR 1 prepared the resume using the name "JAMES HENDERSON." INVESTOR 1 was later directed by CREVELING via email to correct the resume to reflect the name "HENRIKSEN" (i.e., falsely ending in "sen" rather than the actual "son") thereby again falsely representing HENRIKSON'S real name. INVESTOR 1 and HENRIKSON began further conversations about developing a crude oil hauling business. INVESTOR 1 and HENRIKSON discussed the crude oil hauling business with other investors but it did not materialize.

30. On September 7, 2011, INVESTOR 1 and INVESTOR 2, signed and executed a Joint Venture Agreement with BLACKSTONE LLC and HENRIKSON. Your affiant and other law enforcement reviewed the contract and confirmed it was signed in the name of "JAMES HENRICKSEN", under the heading BLACKSTONE LLC. HENRIKSON identified himself as "managing member" and signed under the following: "I hereby personally guarantee the obligation of BLACKSTONE LLC." The Joint Venture agreement dictates that INVESTOR 1 shall be entitled to 12.5% of the monthly gross profits, INVESTOR 2 shall be entitled to 12.5% of the monthly gross profits, and

BLACKSTONE shall be entitled to 75% of the monthly gross profits. An excerpt of the Joint Venture agreement in part and parcel is listed below:

- *By this agreement, the parties create a joint venture to operate an oil field services company for a profit. The joint venture shall be conducted under Blackstone's name and any parents, subsidiaries, and related entities which may be created in the future to facilitate the parties' interests.*
- *The parties reserve the right to pursue other ventures or financial interests so long as they do not infringe upon, conflict with, or interfere with the terms of this agreement.*

31. Initially, INVESTOR 1, and other investors obtained, received a profitable Return on Investment (ROI). INVESTOR 1 stated he and INVESTOR 2 purchased an initial truck for BLACKSTONE LLC. INVESTOR 1 received one ROI payment in the amount of $13,000 from the investment in May of 2012, but received no further payments as per the joint venture agreement which required monthly payment of profits. INVESTOR 1 stated he was paid the initial investment principle amount in May of 2012.

32. INVESTOR 1 stated INVESTOR 3 and other investors purchased the second truck for BLACKSTONE LLC. INVESTOR 1 stated INVESTOR 3 was paid a profitable monthly ROI from March of 2012 through October 2012. INVESTOR 3 was repaid the initial investment principle in March of 2012. INVESTOR 1 stated ROI payments ceased after representations made by HENRIKSON that the truck would not run. INVESTOR 1 stated HENRIKSON told INVESTOR 2 that the second truck was sold in November 2012.

33. INVESTOR 1 stated INVESTOR 3 purchased a third and fourth truck for BLACKSTONE LLC. These trucks were purchased utilizing a loan through a

14

business entity entitled Chopping Motors. INVESTOR 3 was paid a profitable ROI from March 2012 through October 2012 for the investment and purchase of these trucks. INVESTOR 3's original investment principle was repaid in May of 2012. Your affiant and other law enforcement obtained and reviewed text messages between HENRIKSON and INVESTOR 1. On November 19 and 20, 2012, HENRIKSON texted INVESTOR 1 and stated the money for the Chopping Motors leases had been wired.

34. After an initial few profitable months, HENRIKSON began telling INVESTOR 1 in phone conversations that BLACKSTONE LLC was losing money. INVESTOR 1 requested M.M. go to North Dakota and work for BLACKSTONE LLC. INVESTOR 1 began having conversations with other investors, employees, as well as M.M., of BLACKSTONE LLC, about the work that was being performed and the profits that BLACKSTONE LLC was making.

35. INVESTOR 1 was contacted by M.M. and INVESTOR 2 and was told HENRIKSON was operating a crude oil hauling business. INVESTOR 1 learned from EMPLOYEE 1, as later detailed in this affidavit, that HENRIKSON had purchased crude oil tanker trucks. INVESTOR 1 became suspicious after learning this information due to the representations made by HENRIKSON that BLACKSTONE LLC was not making profit. INVESTOR 1 stated HENRIKSON'S representations conflicted with information he received from employees at BLACKSTONE LLC, who had knowledge of the amounts that BLACKSTONE LLC was billing on a monthly basis. INVESTOR 1 stated HENRIKSON did not have any money at the time BLACKSTONE LLC was developed and INVESTOR 1 initially funded payroll, wages, and other expenses. INVESTOR 1 concluded the crude oil tanker trucks were purchased with funds from BLACKSTONE LLC.

0
0
0
6
1

36. INVESTOR 1 began conducting further internet and business records searches into HENRIKSON and CREVELING and learned that HENRIKSON and CREVELING developed about 5 to 6 other business entities including BLACKSTONE CRUDE and BLACKSTONE ELECTRICAL SERVICES, which were previously unknown to INVESTOR 1. Through these records searches, INVESTOR 1 learned the additional business entities were set up in CREVELING'S name. INVESTOR 1 stated the joint venture contract signed by INVESTOR 1, INVESTOR 2, and HENRIKSON, stated the investors were to have an ownership interest in any business HENRIKSON started in the oil industry of North Dakota.

37. After receiving information from employees at BLACKSTONE LLC about the crude oil tankers, as well as the information obtained from his business records searches, INVESTOR 1 confronted HENRIKSON about BLACKSTONE CRUDE. INVESTOR 1 stated HENRIKSON denied on multiple occasions having any knowledge about BLACKSTONE CRUDE LLC. INVESTOR continued to question HENRIKSON about BLACKSTONE CRUDE LLC. INVESTOR 1 stated HENRIKSON later admitted knowledge of the company and that it involved a separate investor. INVESTOR 1 had further conversations with BLACKSTONE LLC employee M.M. and discussed the newly discovered business entities. INVESTOR 1 stated M.M. told him HENRIKSON had been lying to him and cheating him out of money. INVESTOR 1 stated the employees were aware of the additional business entities and identified them as sub-contractors for BLACKSTONE LLC.

38. INVESTOR 1 stated HENRIKSON provided various reasons about late or missed investor payments. INVESTOR 1 stated the joint venture contract required that an independent accountant handle the finances for BLACKSTONE LLC. INVESTOR 1 learned through conversations with

16

00062

0
0
0
6
2

HENRIKSON, CREVELING, employees at BLACKSTONE LLC, and
through litigation, that the independent accountant was Rene Johnson, located
in Watford City, ND. Through a review of obtained records and public record
searches, your affiant identified the accounting firm of Koch and Johnson PC,
233 N. Main, Watford City, ND.

39. INVESTOR 1 stated during various telephone conversations, HENRIKSON
began representing to him that BLACKSTONE LLC was not making money.
INVESTOR 1 provided copies of various text messages between
HENRIKSON and INVESTOR 1. On December 29, 2012, INVESTOR 1
engaged in a text message conversation with HENRIKSON in which
HENRIKSON made the following statements: "you got your money back XX,
I haven't made shit"; "Just waisted [SIC] a lot of time"; "I don't own company
nothing is in my name XX"; "Blackstone is not making anything especially
with hot oiler debt"; "Hid my past? Well I don't tell people about that ever
XX'" "I can go by any alias name"; "Those are with other partners an [SIC]
have nothing to do with blackstone" (In reference to questions about
Blackstone Trucking, Blackstone Crude, Blackwell, and other entities).

40. Based on the representations made by HENRIKSON, INVESTOR 1 and
additional investors agreed to the sale of the BLACKSTONE LLC trucks and
equipment. INVESTOR 1 stated through conversations with HENRIKSON
and other investors, HENRIKSON represented he would pay the investors
$30,000 a piece once the equipment was sold. Based on the representations
made by HENRIKSON, the investors signed and mailed a release to
HENRIKSON authorizing the sale and transfer of title of the trucks and
equipment. HENRIKSON later represented to INVESTOR 1 that the
equipment had been sold on November 20, 2012. INVESTOR 1 stated
HENRIKSON did not make any payment to the investors for the sale of this
equipment. INVESTOR 3 signed and mailed a release of title so that trucks

17

three and four could be sold.  INVESTOR 3 was told by BLACKSTONE LLC that he would receive a $30,000 payment once the release was received.

41. INVESTOR 1 stated HENRIKSON created BLACKWELL LLC which he used as a subcontractor for BLACKSTONE LLC.  INVESTOR 1 learned through employees at BLACKSTONE that about $5,000,000 a month was made during the same time period HENRIKSON represented to investors that BLACKSTONE was not making any money and not paying investors.

42. INVESTOR 1 stated he confronted HENRIKSON about his name, criminal history, and additional business entities.  HENRIKSON admitted hiding his past and claimed BLACKSTONE CRUDE was a separate company with a separate investor in Texas.  INVESTOR 1 stated the investors were not allowed access to the BLACKSTONE LLC bank accounts.  INVESTOR 1 stated the he learned through documentation and conversations with his attorney, BLACKSTONE LLC, and Accountant Johnson, that Accountant Johnson did not verify any of the financial statements.  INVESTOR 1 stated Accountant Johnson represented CREVELING completed the financial statements using Quickbooks, provided them to her, and signed off on them.

43. INVESTOR 1 stated that From March 2012 through October 2012, he received financial profit and loss statements via the U.S. Mail from CREVELING.  INVESTOR 1 stated the documents consisted of summary financial documents listing the profits of each truck and statements for BLACKSTONE LLC.  INVESTOR 1 stated he did not believe the work that was performed by BLACKSTONE LLC, as represented to him by BLACKSTONE LLC employees, was reflected in the financial profit and loss statements.  INVESTOR 1 believed these documents to be fraudulent.

44. Through a review of further text messages between INVESTOR 1 and HENRIKSON, the following representations were made by HENRIKSON to INVESTOR 1 on or about October 2012: "Well ya we brought in a ton of money that got paid out to Leasers an ya millions"; "Heck ya we made profits lotta payroll an breakdown expenses but ya were making money";

45. INVESTOR 1 described inconsistencies in the financial statements which included fuel costs that were significantly varied between trucks operating on similar hours. INVESTOR 1 questioned HENRIKSON about the inconsistencies and was told he would look into it or that the trucks needed repairs. INVESTOR 1 stated he believed he was defrauded by HENRIKSON in three ways: HENRIKSON moved BLACKSONE LLC money into other companies owned by HENRIKSON; HENRIKSON altered the books of BLACKSONE LLC to show the business was not making any money; HENRIKSON then subcontracted BLACKSTONE LLC work to HENRIKSON'S other companies including BLACKSTONE CRUDE and BLACKWELL.

46. EMPLOYEE 1 provided examples of various expenses that have been detailed above and which he identified as suspicious. EMPLOYEE 1 concluded after a review of financial and other information that the expenses for the other business entities were being paid from the BLACKSTONE LLC account. EMPLOYEE 1 questioned the large amounts of these expenses for an account allegedly involved only INVESTOR 1's 4 trucks. The following are some identified transactions as discussed with INVESTOR 1:

   *$50,000 Management Fee; $29,000 for Meals and Entertainment; $370,000 in rent expenses; and $972,000 in wages/payroll.*

47. INVESTOR 1 concluded through his conversations with employees, review of financial statements of BLACKSTONE LLC, and findings about BLACKSTONE CRUDE LLC, that HENRIKSON developed additional business entities using BLACKSTONE LLC money and assets. INVESTOR 1 stated these actions led to BLACKSTONE LLC incurring the overhead and expenses as discussed in paragraph 46.

48. On June 19, 2013, INVESTOR 1 provided law enforcement with detailed information regarding the trucks and equipment purchased by the individual investors for BLACKSTONE LLC. Details of this equipment are listed below. INVESTOR 1 provided law enforcement with photographs of trucks purportedly parked on the property of HENRIKSON AND CREVELING. Your affiant and other law enforcement reviewed these photographs confirmed the residence appears to be **505 17th Avenue NE.** INVESTOR 1 advised the observed trucks are the same trucks purchased with the individual investor's funds. INVESTOR 1 specifically recognized Truck #2, as listed below, due to the "Viper Red" coloring. INVESTOR 1 stated this truck was purchased using the name "JAMES HENDRICKSON."

    A.) Truck #1, 2001 Freightliner FLD120, Class 8 GVW 33001 w/wetkit; VIN: 1FUJAHBD01PE83089.

    B.) Trailer #1, Vacuum Tank Trailer, VIN: 1L9L5T233CH485001, Fruitland RH500 Pump/Hydraulic Motor PL25-7BPBB.

    C.) Truck #2, 200 Freightliner, Classic XL (Viper Red), VIN: 1FUPCSZB9YPF09752.

    D.) Truck #3, 2007 Western Star, VIN: 5KJJABCK77PY39531.

    E.) Truck #4, 2001 Western Star, VIN: 2WKEDDRJ71K96721.

    F.) Trailer #3, 2011 Streamline 150 BPL VAC Trailer, VIN: 4S9SSTV24BB248036.

    G.) Trailer #4, 2011 Streamline 150 BPL VAC Trailer, VIN: 4S9SSTV22BB248035.

### EMPLOYEE 1

49. On December 12, 2013, your affiant and other law enforcement interviewed a former employee (EMPLOYEE 1) of BLACKSTONE LLC.  EMPLOYEE 1 was employed at BLACKSTONE LLC from about February 2012 through August 2012.  EMPLOYEE 1 was hired as an operations manager for BLACKSTONE LLC.  EMPLOYEE 1 duties included, approving and processing accounts receivables and trucking tickets, handling trucking operations, handling driver schedules, working with sales people, dealing with "company men", and handling employees.

50. EMPLOYEE 1 met HENRIKSON through INVESTOR 2.  EMPLOYEE 1 was asked by INVESTOR 2 to work for BLACKSTONE LLC in North Dakota.  Around February 22, 2012, EMPLOYEE 1 traveled to North Dakota and met with HENRIKSON.  EMPLOYEE 1 could not recall the name by which HENRIKSON represented himself and stated he used a different variation of his name by changing a single letter.  EMPLOYEE 1 stated BLACKSONE LLC was operated by HENRIKSON and CREVELING.

51. EMPLOYEE 1 stated it was his understanding and belief that BLACKSTONE LLC was owned by HENRIKSON.  EMPLOYEE 1 stated HENRIKSON had all the money, made all the decisions, and had the connections to the oil men.  EMPLOYEE 1 said he did not do anything without consulting with HENRIKSON.  EMPLOYEE 1 said CREVELING handled the finances including writing checks, paying the bills, and working with the banks.  EMPLOYEE 1 said HENRIKSON could not use a computer and used his phone to conduct business.

52. EMPLOYEE 1 advised BLACKSTONE LLC initially owned about 8 trucks.  BLACKSTONE later owned 18 to 20 trucks and had about 75 "leasers."

EMPLOYEE 1 described "leasers" as non BLACKSTONE LLC owned trucks that leased onto BLACKSTONE LLC. BLACKSTONE LLC would then be responsible for finding the work for the independent "leaser" and would receive a 20% profit work the "leaser" work performed.

53. EMPLOYEE 1 stated he only performed work for BLACKSTONE LLC and was always paid with checks from CREVELING, which were signed in her name. EMPLOYEE 1 said he was not involved in working with the company finances as HENRIKSON and CREVELING never allowed him to see them.

54. EMPLOYEE 1 said HENRIKSON would "do all these weird things" (In reference to Blackstone operations). EMPLOYEE 1 said he was required to keep all the trucks running for certain hours a day. Through conversations with employees, EMPLOYEE 1 knew HENRIKSON made side deals with drivers and purchased them trucks. EMPLOYEE 1 stated these side deals were outside of BLACKSTONE LLC. By owning a side truck with drivers, HENRIKSON was able to make increased profits and direct the side trucks to run more hours.

55. EMPLOYEE 1 said the side trucks earned BLACKSTONE LLC 20% by operating as a "leaser." EMPLOYEE 1 said the 80% difference was not paid to BLACKSTONE LLC, but rather directly received and retained by HENRIKSON through a separate LLC owned by HENRIKSON. EMPLOYEE 1 said if the trucks were owned by BLACKSTONE LLC, BLACKSTONE LLC received 100% of the truck profits. EMPLOYEE 1 said HENRIKSON had numerous side LLCs.

56. EMPLOYEE 1 described a separate LLC ran by HENRIKSON, named BLACKWELL LLC. EMPLOYEE 1 stated he observed trucking tickets received from BLACKWELL LLC, which were billed directly to

22

BLACKSTONE LLC. EMPLOYEE 1 said HENRIKSON ran BLACKWELL
LLC with a driver named "George." EMPLOYEE 1 said he was responsible
for the truck operations, including HENRIKSON'S side trucks. EMPLOYEE
1 said HENRIKSON used the best drivers for his side operations because it
allowed HENRIKSON to make more money.

57. EMPLOYEE 1 believes payments were made to HENRIKSON'S side LLCs,
including BLACKWELL, from BLACKSTONE LLC. EMPLOYEE 1
believes the side LLCs then made payments directly to the drivers.
EMPLOYEE 1 said HENRIKSON used the money from investors that was
intended to operate BLACKSTONE LLC, and purchased other "leaser" trucks,
which were operated more than BLACKSTONE LLC trucks. EMPLOYEE 1
said HENRIKSON directed him to operate certain "leaser" trucks more than
other trucks. EMPLOYEE 1 said he knew these trucks were owned by
HENRIKSON. EMPLOYEE 1 said the BLACKSTONE LLC trucks worked
the entire time he was there, not including the time they were down for
maintenance. HENRIKSON said the trucks were never sold and that
HENRIKSON had them the entire time EMPLOYEE 1 was there.

58. EMPLOYEE 1 explained that truck drivers were responsible for obtaining
trucking tickets at various job sites. These tickets were then taken to
BLACKSTONE LLC where they were processed and provided to the
BLACKSTONE LLC accountant (Rene Johnson). EMPLOYEE 1 explained
all of the tickets were run under BLACKSTONE LLC, including the side
"leaser" trucks that HENRIKSON owned with drivers. BLACKSTONE LLC
maintained separate records for their owned trucks and the "leaser" trucks.

59. Through reviews of trucking tickets, conversations with other employees, and
personal knowledge, EMPLOYEE 1 concluded HENRIKSON used money
from investors of BLACKSTONE LLC to purchase other trucks, which he ran

and made further profits from.  EMPLOYEE 1 said HENRIKSON did not pay the investors back the money which they believed they would receive for investing with HENRIKSON.

60. EMPLOYEE 1 lived with HENRIKSON and CREVELING at their residence in Watford City (505 17th Avenue NE), from about May 2012 through August 2012.  EMPLOYEE 1 stated INVESTOR 2 and CREVELING entered into an arrangement to purchase a house together.  As discussed later in this affidavit, this property was identified as 505 17th Avenue NE.  EMPLOYEE 1 observed CREVELING utilize a laptop at the residence and observed boxes of trucking tickets that were to be taken to their accountant.  EMPLOYEE 1 also observed a safe located in a bedroom of the residence belonging to HENRIKSON, which contained several guns.  EMPLOYEE 1 stated HENRIKSON also slept with a gun.  EMPLOYEE 1 was last inside the residence in August of 2012.

61. EMPLOYEE 1 was aware through his direct knowledge of BLACKSTONE LLC operations and reviews of trucking tickets, that BLACKSTONE LLC was making a gross profit of $1,000,000 a month when he began working there.  EMPLOYEE 1 said BLACKSTONE LLC was gross profiting about $3,000,000 a month at the time he left the business.  EMPLOYEE 1 said he was aware of these figures because he was responsible for working with the number of hours their trucks operated.  EMPLOYEE 1 said BLACKSTONE LLC trucks would make gross profits of anywhere from $12,000 to $25,000 a day.  EMPLOYEE 1 said these profits did not include the fracking operations that were performed.  EMPLOYEE 1 said he bid fracking jobs at $350,000 to $600,000.  EMPLOYEE 1 stated they initially ran fracking operations 1 to 2 times a month, which was increased to 1 to 2 times a week at the time he left.

62. After leaving BLACKSTONE LLC, EMPLOYEE 1 conducted internet searches and discovered HENRIKSON had used a false name and had

criminal history and other derogatory information.  Based on his findings and observations of CREVELNG'S name listed on payroll checks, EMPLOYEE 1 suspected HENRIKSON placed everything in CREVELING'S name so that people could not review and identify his background.

**INVESTOR 2**

63. On December 13, 2013, your affiant and other law enforcement interviewed INVESTOR 2.  It should be noted that much of the information obtained from INVESTOR 2 has been incorporated in this affidavit through information obtained through other interviews and review of documents.  INVESTOR 2 became involved with BLACKSTONE LLC and HENRIKSON through INVESTOR 1.  INVESTOR 2 agreed to invest in a truck for BLACKSTONE LLC and eventually moved out to North Dakota to watch his money.  After arriving in North Dakota, INVESTOR 2 became involved in soliciting work for the BLACKSTONE LLC trucks and obtaining other trucks to lease onto BLACKSTONE LLC.  INVESTOR 1 initially invested $33,000 for the purchase of an initial truck and was to receive a percentage of the monthly profits.

64. INVESTOR 2 learned HENRIKSON had set up multiple companies. INVESTOR 2 believed he was investing in BLACKSTSONE LLC, but HENRIKSON discussed BLACKSTONE BUILDING GROUP.  INVESTOR 2 stated HENRIKSON moved money around between different accounts. INVESTOR 2 was eventually re-paid his initial investment of $33,000 including interest.  INVESTOR 2 stated the accountant for BLACKSTONE LLC was Rene Johnson, in Watford City, ND.  INVESTOR 2 stated he requested multiple times to review the finances and talk to the accountant, but was met with negative results.  INVESTOR 2 said his calculations led him to believe BLACKSTONE LLC was making $1,000,000 to $2,000,000 a month.

25

INVESTOR 2 said he was always denied by HENRIKSON when attempting to review the finances.

65. INVESTOR 2 stated he believed the joint venture contract with HENRIKSON was fraudulent. INVESTOR 2 felt the contract was fraudulent because it was signed by HENRIKSON in a false name and that BLACKSTONE LLC was in the name of CREVELING and not owned by HENRIKSON. INVESTOR 2 stated the venture contract indicated that any money or business ventures gained from the truck investment, the investors would receive a percentage of.

66. INVESTOR 2 stated that under the contract and based on promises of HENRIKSON, profits earned from the initial truck investment were to be used for the purchase of an additional truck. INVESTOR 2 stated this pattern was to continue for a year and the investors would split the profits. INVESTOR 2 said his understanding was HENRIKSON began using the money to invest in trucks and side companies which HENRIKSON owned. INVESTOR 2 stated HENRIKSON then used these trucks to operate as a leaser under BLACKSTONE LLC. HENRIKSON began telling INVESTOR 2 that BLACKSTONE LLC did not have any money. INVESTOR 2 observed invoices showing BLACKSTONE LLC in fact had large amounts of money.

67. INVESTOR 2 stated he witnessed HENRIKSON operate other business entities with CREVELING. INVESTOR 2 said HENRIKSON wanted certain trucks operating more. INVESTOR 2 stated the leaser trucks which HENRIKSON directed to operate more, did not complain about being paid. This led INVESTOR 2 to conclude that HENRIKSON was paying these leaser trucks. INVESTOR 2 stated HENRIKSON began operating the business through Maheshu Energy LLC, as referenced and discussed later in this affidavit. HENRIKSON told INVESTOR 2 he did not have access to the finances when operating under Maheshu.

26

68. INVESTOR 2 invested approximately $60,000 to $70,000 for the operation of a mechanic shop where BLACKSTONE LLC trucks could be repaired. The mechanic shop was developed so repairs could be performed in-house and save BLACKSTONE LLC money. INVESTOR 2 stated he was to perform the repairs and bill BLACKSTONE LLC for the labor, costs, and equipment. INVESTOR 2 stated he invoiced HENRIKSON for the expenses and was never paid.

69. INVESTOR 2 also invested in a residential property with CREVELING and HENRIKSON. Through review of public record databases, contacts with financial institutions, and review of property records, your affiant confirmed this residential property is located at 505 17th Avenue NE. INVESTOR 2 stated he invested $135,000 into the property and signed a side contract with CREVELING for ownership of the property. INVESTOR 2 said CREVELING obtained the remainder of the financing through a bank. INVESTOR 2 stated he did not receive any of his money back from the investment and recently filed a Lis Pendens claiming an interest in the property.

**INVESTOR 3**

70. On December 30, 2013, your affiant and other law enforcement interviewed INVESTOR 3. INVESTOR 3 provided similar information as previously referenced in this affidavit through INVESTOR 1 and INVESTOR 2. INVESTOR 3 stated sometime in 2011, along with other investors, he became involved in the BLACKSTONE LLC investment through INVESTOR 1. INVESTOR 3 stated INVESTOR 1 became involved in the development of a trucking company with BLACKSTONE LLC. INVESTOR 3 stated BLACKSTONE LLC needed individual investors to purchase trucks as they

were unable to obtain larger investors. INVESTOR 3 stated the larger investors wanted contracts from the oil companies, which BLACKSTONE LLC did not have.

71. INVESTOR 3 invested in an initial water truck with BLACKSTONE LLC through INVESTOR 1. INVESTOR 1 invested $25,000 on behalf of INVESTOR 3 for the purchase of a water truck. INVESTOR 3 completed a contract, along with other investors. INVESTOR 3 and other investors, invested in the purchase of the single water truck. INVESTOR 3 stated the agreement was for him to be re-paid in 6 months, plus a one time 20% payment (120% ROI). INVESTOR 3 stated after the initial 6 months, he was to begin receiving a 10% monthly payment of profits the truck made. During the initial truck investment, INVESTOR 3 did not have any direct dealings with HENRIKSON or CREVELING. INVESTOR 3 stated all of the contracts and monthly payments for the initial truck investment were handled by INVESTOR 1. INVESTOR 3 stated he did receive the ROI via bank transfer from either INVESTOR 1 or CREVELING.

72. Approximately one month after the initial investment in 2011, INVESTOR 3 invested in two additional water trucks for BLACKSTONE LLC. Specific details regarding the trucks have been previously incorporated in this affidavit through information obtained through INVESTOR 1. INVESTOR 3 advised the additional two trucks were leased through Chopping Motors in his name, and the monthly payments were to be made by BLACKSTONE LLC. INVESTOR 3 stated he signed and completed joint venture contracts with BLACKSTONE LLC for the two additional truck investments. INVESTOR 3 stated he paid $50,000 to Chopping Motors for the purchase of the second and third trucks. INVESTOR 3 stated he was again to receive a 120% ROI in 6 months, plus monthly profit payments. After about 3 months, INVESTOR 3 was contacted by Chopping Motors and was informed the lease had not been

paid. INVESTOR 3 stated the venture contract expired and he did not receive his return of 120% return of the investment.

73. After receiving the initial ROI payments for the first truck investment, INVESTOR 3 began having conversations with HENRIKSON to locate individual investors for BLACKSTONE LLC, for the purchase of additional trucks. INVESTOR 3 stated he believed HENRIKSON was the CEO of the company and he was responsible for running it. INVESTOR 3 stated HENRIKSON completed the venture contracts with different name variations. INVESTOR 3 stated he received a call from HENRIKSON regarding the purchase of a hot oiler truck unit in Canada. HENRIKSON informed INVESTOR 3 that this type of truck was in high demand and made 10 times more than the water trucks. INVESTOR 3, along with 3 additional family investors, equally invested in the purchase of the hot oiler unit truck, for the total amount of $367,000 to $397,000.

74. INVESTOR 3 travelled to North Dakota to meet HENRIKSON and verify that BLACKSTONE LLC was real. INVESTOR 3 along with the additional investors had direct negotiations with HENRIKSON and CREVELING to prepare a venture contract. INVESTOR 3 completed the contract and emailed it to CREVELING. INVESTOR 3 stated he worked directly with CREVELING who was in contact with the company in Canada. INVESTOR 3 wire-transferred the funds to a bank account in Canada at the direction of CREVELING. INVESTOR 3 said they were to receive 120% ROI plus a 10% monthly residual payment, as well as a $1,000 a month good faith payment. INVESTOR 3 stated the contract was valid until the vehicle was no longer in use.

75. INVESTOR 3 stated BLACKSTONE LLC began missing monthly ROI payments for the 2nd and 3rd trucks at the time they were due. INVESTOR 3

29

00075

said monthly residual payments for the 1st truck were received late by
INVESTOR 1. INVESTOR 3 stated he became responsible for receiving the
payments from BLACKSTONE LLC and distributing them among the
investors that he had acquired. INVESTOR 3 began communicating with
CREVELING and ultimately received the ROI for the 2nd and 3rd trucks via
wire transfer from CREVELING. INVESTOR 3 stated CREVELING became
frantic and they argued about a late payment penalty. INVESTOR 3 said the
ROI payments were not received in the full amount. INVESTOR 3 questioned
CREVELING about the amounts and stated she became upset, questioning
INVESTOR 3 why he needed to be so specific about numbers.

76. INVESTOR 3 stated he contacted HENRIKSON and CREVELING and was
   told various reasons for the incorrect or missed ROI payments including: they
   were awaiting payment from their fulfillment and/or factoring company; they
   factored the numbers wrong; they had to pay everyone else and there were not
   enough receivables. INVESTOR 3 stated he received little information about
   the hot oiler unit. INVESTOR 3 stated HENRIKSON claimed there were
   issues at the Canadian border and they needed to wait for a processing
   company to handle processing the hot oiler unit from Canada to the U.S.
   INVESTOR 3 said he was told the hot oiler unit eventually made it to
   BLACKSTONE LLC but was told it was not operating for various reasons:
   such as it was awaiting a part or it was in need of repairs. INVESTOR 3
   stated the venture contract required the hot oiler unit to be titled in the investor
   names and was falsely informed by HENRIKSON that it was. INVESTOR 3
   stated the truck was never titled in the investor names. A review of ND motor
   vehicles records currently list 3 former investor trucks, previously identified
   by INVESTOR 1 in paragraph 47, that are currently registered to
   BRIDGEWATER LLC, PO BOX 2388, Watford City, ND, an additional
   entity operated by HENRIKSON and CREVELING.

77. INVESTOR 3 stated at the time the ROI payments were due for the oiler unit, he was told various reasons as to why the payments were not being made. INVESTOR 3 was told it was unfair for ROI payments to be issued when the oiler was not put into use. INVESTOR 3 held a conference call with his attorney and HENRIKSON. INVESTOR 3 said they negotiated for HENRIKSON to make a payment of $10,000, as this is what he could afford. HENRIKSON later told INVESTOR 3, he was attempting to sell the 2nd and 3rd trucks purchased by INVESTOR 3, allowing HENRIKSON to obtain money and pay INVESTOR 3. INVESTOR 3 stated the lease payments for the 2nd and 3rd trucks were paid in full, resulting in the trucks being titled to INVESTOR 3. INVESTOR 3 stated his monthly payments ceased and he was informed by HENRIKSON that the 1st, 2nd, and 3rd trucks were no longer profitable and were sitting in the lot unused. INVESTOR 3 received email documents from BLACKSTONE LLC for INVESTOR 3 to release title of the trucks and authorize their sale by BLACKSTONE LLC.

78. INVESTOR 3 received financial statements from CREVELING via the mail. INVESTOR 3 said he felt there were discrepancies in the financial statements. INVESTOR 3 observed similar truck repairs that were completed in different months, but with varied expenses. HENRIKSON told INVESTOR 3 that no significant repairs were performed. INVESTOR 3 stated the numbers were all over the place and he felt the numbers were fabricated. INVESTOR 3 received the monthly payment via check from CREVELING, along with the financial statement for the monthly truck performance. INVESTOR 3 stated the average monthly payments he received from BLACKSTONE LLC were between $4,000 and $6,000.

79. INVESTOR 3 said he was contacted by INVESTOR 1 who discovered HENRIKSON'S criminal history and information that led them to believe BLACKSTONE LLC may not be legitimate. INVESTOR 3 decided he

31

needed to protect his investment and requested all the documentation regarding the hot oiler unit. INVESTOR 3 continually requested the documentation and HENRIKSON had various reasons for not providing it. INVESTOR 3 hired an individual to recover the hot oiler unit from North Dakota so that it may be sold. INVESTOR 3 was told the truck was located on the lot of BLACKSTONE LLC. HENRIKSON later stated he would have the truck moved to a separate lot for INVESTOR 3. INVESTOR 3 stated the truck was never moved and was told by HENRIKSON this was due to driver error.

80. INVESTOR 3 contacted HENRIKSON for several days and the hot oiler unit was ultimately delivered to the lot. INVESTOR 3 had a mechanic inspect the vehicle and discovered that wiring had been cut. Furthermore, INVESTOR 3 discovered the vehicle had an odometer reading of 80,000 miles more than it registered when transported from Canada. INVESTOR 3 stated the hot oiler unit was transported from Canada in March of 2012, and was recovered by INVESTOR 3 in January 2013. INVESTOR 3 theorized that BLACKSTONE LLC operated the hot oiler until the point it needed repairing. INVESTOR 3 said he never received any payments for the investment in the hot oiler unit. INVESTOR 3 stated he and his family decided not to pursue the matter due to HENRIKSON'S criminal history and background.

## REAL ESTATE/VEHICLES/PROPERTY

81. Your affiant and other law enforcement received information from lending institution McKenzie County Bank. Information provided by McKenzie County Bank revealed that 505 17th Avenue NE was purchased by CREVELING on March 30, 2012 in the amount of $450,000, with a loan amount of $313,718. The total purchase price of the home and the loan amount obtained by CREVELING corresponds to the statement made by

32

Case 4:14-mj-00004-C_M *SEALED*   Document 1-1   Filed 0_/13/14   Page 33 of 45

INVESTOR 2 in paragraph 69 where INVESTOR 2 stated he invested $135,000 in the residence. Financial records indicate the loan for the property is held solely in the name of CREVELING. The obligated monthly mortgage payment is $1,775.00, with the last payment received on December 17, 2013. McKenzie County Bank records show monthly mortgage payments being made from Wells Fargo account number ending in 8899 in the name of BLACKWELL SERVICES LLC, 1940 S. Broadway PMB 154, Minot, ND, as wells as Bank of America account number ending in 7263, in the name of BLACKSTONE LLC.

82. Your affiant and other law enforcement reviewed North Dakota motor vehicle records for HENRIKSON AND CREVELING. There were no motor vehicle records identified for HENRIKSON. The following vehicles were identified and registered to CREVELING. Vehicle A, a 2005 Bentley Continental, was purchased by CREVELING on July 5, 2013, in the amount of $60,099. Your affiant and other law enforcement learned that CREVELING purchased the vehicle with a cashier's check drawn from Wells Fargo account number ending in 8899, in the name of BLACKWELL SERVICES LLC, as referenced in paragraph 81. As previously referenced in this affidavit and in paragraph 81, the mortgage at 505 17th Avenue NE, has been and is actively being paid from a Wells Fargo account in the name of BLACKWELL SERVICES. The full list of the identified vehicles registered to CREVELING are as follows:

     A.) 2005 Bentley Continental GT AWD, VIN:
        SCBCR63W35C027790, ND License: KBB165.
     B.) 2012 Ford F-350 Super Duty, VIN:
        1FT8W3BT9CEB54501, ND License: JSM893.
     C.) 2005 Dodge Ram 2500 Quad ST/SLT, VIN:
        3D7KS28C75G766202, ND License: JRS154.

D.) 2011 Ford F-350 Super Duty, VIN:
1Ft8W3BT9BEC63104, ND License: JOS865.

E.) 2013 Honda CRF450R, VIN: JH2PE053XDK203465, ND
License: AT10366.

F.) 2012 Honda 1RB, VIN: JH2KE03C0CK300511, ND
License: AT10365.

## MAHESHU

83. In January of 2012, BLACKSTONE LLC partnered with Tex Hall and began
operating out of the Maheshu LLC office in New Town, ND.  Maheshu was a
Native American owned company that operated on reservation land.  Maheshu
subcontracted with BLACKSTONE LLC.  Your affiant learned through a
review of court filings and interviews, that the BLACKSTONE LLC and
Maheshu contract was terminated.

## CIVIL PROCEEDINGS

84. On July 22, 2013, CREVELING and HENRIKSON were deposed in a civil
matter in the Superior Court for the State of Washington for case number: 12-
2-13331-5.  During the deposition, CREVELING stated she was the owner of
BLACKSTONE LLC, and operated it with her husband, HENRIKSON.
CREVELING stated she and HENRIKSON were married on August 16, 2011.
CREVELING stated their business consisted of trucking services to and from
North Dakota oil and gas fields.  CREVELING stated they had contractual
relationships with Maheshu Energy, XTO Energy, Petro Hunt, Kodiak Oil and
Gas, and Continental.  CREVELING stated the contract with Maheshu Energy
was their most important and the bulk of their business.  This contact allowed
them to operate on tribal land.  CREVELING stated the previous year their
company grossed about 2 million in profits.  During the deposition

34

0
0
0
8
0

HENRIKSON stated he was also the owner of BLACKSTONE LLC, and operated it with his wife, CREVELING.

**BRIDGEWATER ENERGY**

85. On or around November 2013, law enforcement involved in this investigation received a complaint from a trucking company operating in North Dakota and doing business with Bridgewater Energy. The trucking company leased onto Bridgewater Energy LLC to assist in hauling production water. The letter indicated suspicious activity was discovered in that trucks supposedly owned by Bridgewater, contained registrations under the name Blackstone Trucking. The company was informed the trucks were being sent from Colorado, however, they appeared to have been leased by Maheshu Energy, LLC. Furthermore, an individual using the name of Cole Johnson, and identifying himself as business partner with Bridgewater, began calling the trucking company and directing their trucks.

86. The trucking company contacted Bridgewater LLC regarding Cole Johnson and was told he was a consultant for Bridgewater. The trucking company indicated they received a text message that said "don't call me James anymore, my new name is Cole Johnson." Your affiant reviewed NDSOS records and identified Bridgewater Energy LLC as a Foreign Limited Liability Company with a principal office in Spokane, WA. The identified registered agent is Koch, Johnson, &Co., PC, 233 N. Main Street, Watford City, ND. As previously referenced in this affidavit, this is the same accountant that prepared the financials and other records for HENRIKSON, CREVELING, and their additional business entities.

87. Records obtained and reviewed by your affiant and other law enforcement, for BRIDGEWATER LLC., indicate this company is registered as a Foreign

Limited Liability Company from Washington. BRIDGEWATER LLC has an original filing date of August 15, 2013 and is active and good standing. NDSOS records identity a principal office of 2505 S. Garfield Road, Spokane, WA 99203. The listed registered agent is Koch, Johnson & Co., PC, 233 N. Main Street, Watford City, ND. As previously referenced throughout this affidavit Rene Johnson, from this firm has been identified as the independent accountant for the previously referenced entities.

88. Your affiant and other law enforcement have obtained North Dakota vehicle registration information for a 2007 Western Star Truck, a 2011 Streamline Truck, and a 2011 Streamline Truck, as referenced in paragraph 48. North Dakota registration information identified valid and current registrations for these vehicles in 2014, registered to BRIDGEWATER ENERGY LLC, PO BOX 2388, Watford City, ND. Your affiant learned from USPS records that PO BOX 2388 is registered to BLACKSTONE LLC and BLACKSTONE CRUDE LLC. USPS records indicate this PO BOX was applied for by SARAH CREVELING using a physical address of 505 17th Avenue NE, and was opened on August 29, 2012. The PO BOX is currently open and valid. The authorized names to receive mail at this PO BOX include "JAMES HENRICKSEN," SARAH CREVELING, Jay Wright, and Bryan Dziedic.

89. On January 7, 2014, law enforcement attempted to interview HENRIKSON and CREVELING at 505 17th Avenue NE, in reference to a separate crime. While at the residence, law enforcement observed 3 laptop computers and a laptop/tablet. Furthermore, law enforcement observed a large amount of paperwork consistent with invoices and billing. The paperwork had multiple colored copies attached and were separated into different piles with different invoices. Law enforcement interviewed a former employee of Maheshu Energy LLC who indicated she was currently working for HENRIKSON'S

company, BRIDGEWATER LLC. The employee stated her duties included entering invoices and handling billing.

90. Additionally on January 7, 2014, law enforcement interviewed a Confidential Information. CI stated he/she worked for HENRIKSON for more than a year hauling water and oil. CI stated HENRIKSON has 17 trucks and hauls oil and water. CI said HENRIKSON uses the name COLE JOHNSON and CREVELING uses the name AMY PETERSON. CI stated HENRIKSON uses false names because he has been banned from doing business by most of the oil companies around Watford City because of his business practices.

## SUMMARY OF FINANCIAL FINDINGS

91. Your affiant and other law enforcement reviewed identified financial bank accounts pertaining to HENRIKSON, CREVELING, and their business entities. A review of these accounts is consistent with information obtained from interviews and other documents. Law enforcement identified numerous funds transfers and checks, transferring money through the various accounts held by CREVELING. CREVELING is identified as the signature authority on US Bank Account number ending in 9539 (BBG ACCOUNT 1) opened on September 30, 2011 in the name of BLACKSTONE BUILDING GROUP LLC, 7301 N RR 620 RD STE 155-154, Austin, Texas. From on or about September 30, 2011 through May 31, 2013, law enforcement identified approximately $3,570,435 in total deposits into BBG ACCOUNT 1. These deposits consisted of checks from known oil companies made payable to BLACKSTONE/BLACKSTONE LLC/BLACKSTONE BUILDING/BLACKSTONE BUILDING GROUP/BLACKSTONE OIL FIELD SERVICES. From on or about September 30, 2011 through May 31, 2013, law enforcement identified approximately $3,563,639 in total withdrawals, including $2,600,500 in bank transfers to Bank of America

Account number ending in 7263 (BBG ACCOUNT 2).  Bank of America
Account number ending in 7263 is held in the name of BLACKSTONE
BUILDING GROUP LLC, 8225 N FM 620 Apt 311, Austin, Texas.

92. CREVELING is identified as the signature authority on US Bank Account
4661 (BOFS ACCOUNT 1) opened on November 1, 2011 in the name of
BLACKSTONE OIL FIELD SERVICES LLC, 15033 Nacogdoches Rd, Ste
104, San Antonio, Texas.  On or about November 1, 2011 through February
28, 2013, law enforcement identified approximately $4,522,216 in total
deposits into BOFS ACCOUNT 1.  These deposits consisted of checks from
known oil companies and factoring companies made payable to
BLACKSTONE OIL FIELD SERVICES, LLC/BLACKSTONE OIL FIELD
SERVICES/BLACKSTONE OIL FIELD.  On or about November 1, 2011
through February 28, 2013, law enforcement identified approximately
$4,522,137 in total withdrawals, including $212,000 in bank transfers to BBG
ACCOUNT 1, $75,000 in bank transfers to BBG ACCOUNT 2.

93. Your affiant and other aw enforcement determined Bank of America Account
number ending in 7263 (BBG ACCOUNT 2) is held in the name of
BLACKSTONE BUILDING GROUP LLC, 8225 N FM 620 Apt 311, Austin,
Texas.  On or about February 2011 through June 30, 2013 law enforcement
identified $8,119,293 in total deposits including $2,600,500 in bank transfers
from US Bank BBG ACCOUNT 1, $75,000 from BOFS ACCOUNT 1,
$50,139 in wire transfers from INVESTOR 1, and $47,000 in wire transfers
from/to BLACKSTONE CRUDE.  Withdrawals from BBG ACCOUNT 2
total approximately $7,995,245 and include bank transfers to BBG
ACCOUNT 1 and BOFS ACCOUNT 1 in the amounts of $7,500 and $38,575,
respectively.  Withdrawals included $10,000 wired to BLACKSTONE
ELECTRICAL SERVICES; $70,000 from BLACKWELL SERVICES, and
$92,000 to SARAH CREVELING personally.

94. Bank of America Account 1045 (BBG ACCOUNT 3) is held in the name of
BLACKSTONE BUILDING GROUP LLC, 1940 S Broadway PMB 154,
Minot, North Dakota.  BBG ACCOUNT 3 received a wire transfer from
Southwest Heritage in the amount of $73,000 and subsequently wire
transferred to Chopping motors.

## BLACKSTONE LLC PAYMENTS

95. Through a review of the identified financial records, your affiant and other law
enforcement have identified several transactions that appear to be consistent
with statements made by investors, employees, and witnesses, which show the
use of BLACKSTONE LLC to pay HENRIKSON, CREVELING, and
business entities they established.  The following are some examples:

*On March 6, 2012, wired $21,744 to Wright Express (Fleet Gas Payment)
with a note that read Blackstone Crude.*

*On September 21, 2012 and numerous other dates, Blackstone Building
Group made payment to Ford Motor Credit Company in the amount of
$6,000 and other amounts.  These payments appear to be consistent with a
2012 F-350 purchased on March 23, 2012 in the amount of $53,250, and
currently registered in the name of Sarah Creveling, and/or a 2011 Ford
F-350 purchased on September 29, 2011 in the amount of $63,800, both
having liens from Ford Motor Credit Company, and also currently
registered in the name of Sarah Creveling. (these purchases are
referenced above in paragraph 81).*

*On A $92,000 wire transfer from BBG to Sarah Creveling*

*A $10,000 wire transfer from Blackstone Building Group to Blackstone Electrical Services.*

*A $70,000 from Blackwell Services to BBG*

*A $1,775.00 payment from Blackstone LLC to McKenzie County Bank for the above referenced mortgage.*

### SEIZURE OF EQUIPMENT AND DATA

96. The aforementioned facts demonstrate probable cause to believe that **505 17th Avenue NE** was purchased in part with funds obtained from the alleged fraud and therefore constitutes proceeds of the illegal conduct outlined in this affidavit and has been and is being used to commit federal criminal offenses, including violations of Title 18, United States Code, Section, 1341, 1343, and 1957; and that the items listed in **Attachment B**, constituting evidence of those violations will be located there. Based on my experience and information that I have obtained from others experienced in such investigations this evidence will include various pieces of computer hardware, computer software, computer storage media, and computer records. I know that when an individual uses a computer to generate fraudulent documents, the computer will generally serve both as an instrumentality for committing the crime, and also as a storage device for evidence of the crime.

97. The computer is an instrumentality of the crime because it is "used as a means of committing [the] criminal offense" according to Federal Rule of Criminal Procedure 41(b)(3). The computers are also likely to be a storage device for evidence of crime because individuals involved in such financial schemes intentionally or inadvertently maintain records and evidence relating to their crimes on their computers. As such, the evidence obtained during the

40

requested search may provide vital details regarding the files accessed from
the computers, copies of fraudulent documents, and copies of fraudulent share
certificates and registrations created by the suspects as part of their scheme.

98. Your affiant also knows that during the search of the premises it is rarely
possible to complete on-site examination of computer equipment and storage
devices for a number of reasons, including the following:

   a. Searching computer systems is a highly technical process which
   requires specific expertise and specialized equipment. There are
   many types of computer hardware and software in use today that it is
   rarely possible to bring to the search site all of the necessary
   technical manuals and specialized equipment necessary to conduct a
   thorough search. In addition, it may also be necessary to consult with
   computer personnel who have specific expertise in the type of
   computer, software application, or operating system that is being
   searched.

   b. The best practices for analysis of computer systems and storage
   media rely on rigorous procedures designed to maintain the integrity
   of the evidence and to recover hidden, mislabeled, deceptively-
   named, erased, compressed, encrypted, or password-protected data
   while reducing the likelihood of inadvertent or intentional loss or
   modification of data. A controlled environment, such as a law
   enforcement laboratory, is typically required to conduct such an
   analysis properly.

   c. The volume of data stored on many computer systems and storage
   devices will typically be so large that it will be highly impractical to
   search for data during the execution of the physical search of the
   premises. The hard drives commonly included in desktop computers
   are capable of storing millions of pages of text.

d. The ability to encrypt data also can complicate the mere mirroring of hard drives on site, since recreating the data may require the exact same hardware setup to function properly. It is, therefore, often necessary to re-connect all the original hardware and software in a controlled computer laboratory setting in order to retrieve the relevant evidence and data accurately.

99. Due to the volume of data at issue and the technical requirements set forth above, it may be necessary that the above-referenced equipment, software, data, and related instructions be seized and subsequently processed by a qualified computer specialist in a laboratory setting. Under the appropriate circumstances, some types of computer equipment can be more readily analyzed and pertinent data seized on-site, thus eliminating the need for its removal from the premises. One factor used in determining whether to analyze a computer on-site or to remove it from the premises is whether the computer constitutes an instrumentality of an offense and is thus subject to immediate seizure as such or whether it serves as a mere repository for evidence of a criminal offense. Another determining factor is whether, as a repository for evidence, a particular device can be more readily, quickly, and thus less intrusively, analyzed off-site, with due considerations given to preserving the integrity of the evidence. This, in turn, is often dependent upon the amount of data and number of discrete files or file areas that must be analyzed, and this is frequently dependent upon the particular type of computer hardware involved. As a result, it is ordinarily impossible to appropriately analyze such material without removing it from the location where it is seized.

100. Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in forensic examination of computers, I am aware that searches and seizures of evidence from computers taken from the premises commonly require agents to seize

most or all of a computer system's input/output and peripheral devices. This is done so that qualified computer experts can accurately retrieve the system's data in a laboratory or other controlled environment. Therefore, in those instances where computers are removed from the premises, in order to fully retrieve data from a computer system, investigators must seize all the storage devices, as well as the central processing units, and applicable keyboards and monitors which are an integral part of the processing unit. If, after inspecting the input/output devices, system software, and pertinent computer-related documentation, it becomes apparent that these items are no longer necessary to retrieve and preserve the data evidence, and are not otherwise seizeable, such materials and/or equipment will be returned within a reasonable time.

101.    The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file directories and the individual files that they contain(analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence authorized for seizure by the warrant); examining all the structured, unstructured, deleted, and overwritten data on a particular piece of media; opening or reading the first few pages of such files in order to determine their precise contents; scanning storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic key-word searches through all electronic storage areas to determine whether occurrences of such language contained in the storage areas are intimately related to the subject matter of the investigation.

102.    As referenced in paragraph 24, criminal history records reveal HENRIKSON has prior violent felony convictions including attempting to

elude police, 2nd degree burglary, and attempt to commit a crime-assault II.
Also as referenced in paragraph 60, witnesses have observed a safe located in
a bedroom of the residence belonging to HENRIKSON, which contained
several guns.  The witness further stated HENRIKSON also slept with a gun.
Furthermore, records obtained by your affiant and other law enforcement
reveal CREVELING possesses a concealed weapons permit.  As such, your
affiant respectfully requests authority to conduct a no knock search warrant.

103.   Additionally, law enforcement involved in this investigation, and through
surveillance; have identified a secondary location in which trucking equipment
is located associated to the above named entities.  On January 8, 2013, law
enforcement involved in this investigation conducted surveillance and
identified a location consisting of two buildings, various trucking equipment,
trailers, and trucks, and is enclosed by a chain link fence.  The property is
located on the north side of 6th Avenue NE, Watford City, ND, and east of
125th Avenue NW, Watford City, ND, and is further described in Attachment
A-2.  Surveillance identified a semi truck with the emblem "Bridgewater
Energy", as well as a second truck with North Dakota registration returning to
Blackwell Services, PO BOX 2388, Watford City, ND.  As previously
referenced in this affidavit this PO BOX is registered to BLACKSTONE LLC,
BLACKSTONE CRUDE LLC, SARAH CREVELING, and other entities
listed throughout this affidavit.

104.   Based on the above information, your affiant submits that probable cause
exists to believe that evidence, fruits and/or instrumentalities of crime are
present at 505 17th Avenue NE.  Your affiant therefore requests that a search
and seizure warrant be issued, authorizing your affiant and other law
enforcement to search the property and premises at 505 17th Avenue NE, as
described in Attachment A, for the items listed in Attachment B.

**FURTHER AFFIANT SAYETH NOT.**

Thomas D. Irvin
Inspector
U.S. Postal Inspection Service

Subscribed and sworn to me
This 13th day of January, 2014.

Charles S.Miller, Jr.,
Magistrate Judge
United States District Court

**Attachment A**

**Description – Single Family Residence located at
505 17th Ave NE, Watford City, ND 58854**

Image 1



505 17th Ave NE, Watford City 58854, is a single family home located on the south side of 17th Ave NE approximately 800 feet east of County Rd 33 in McKenzie County, ND. The home is a brown/green colored rambler with light colored trim and two light colored garage doors. The garage doors face west and are attached to structure. This location includes any/all vehicles, trailers, recreational vehicles, and/or outbuildings located on the property, as illustrated in 'Image 2'.

00092

00003

Case 4:14-mj-00004-CSM *SEALED*   Document 1-2   Filed 01/13/14   Page 2 of 2

Image 2

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

a.  Computer input and output devices including but not limited to keyboards, mice, scanners, printers, monitors, network communication devices, modems and external or connected devices used for accessing computer storage media.

b.  Electronic storage media and digital content including but not limited to floppy disks, hard drives, tapes, DVD disks, CD-ROM disks, flash drives or other magnetic, optical or mechanical storage which can be accessed by computers to store or retrieve data.

c.  Computer software and application software installation and operation media.

d.  Items or files containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized.

e.  Correspondence, billings, receipts, bank statements, credit accounts, credit card numbers, wires, stock and share certificates, tax forms or other documents (whether digital or written) pertaining to the operation of Blackstone LLC, Blackstone Crude LLC, Blackstone Building Group LLC, Blackwell Services LLC, Blackstone Oilfield Services LLC and any other, as of yet, undiscovered company or LLC owned, operated or managed by JAMES TERRY HENRIKSON and/or SARAH CREVELING and/or any alias or variation referenced in the affidavit such as JAMES TERRY HENRICKSON, JAMES TERRY HENDERSON, JAMES TERRY HENDRIKSEN, JAMES TERRY HENDRIKSON, JAMES TERRY HENRICKSEN, JAMES TERRY HENRIKSEN, COLE JOHNSON, and AMY PETERSON.

f.  Records reflecting names, addresses, and/or telephone numbers of any or all persons who were or are employees, officers, agents or independent contractors of BLACKSTONE LLC, BLACKSTONE CRUDE LLC, BLACKSTONE BUILDING GROUP LLC, BLACKWELL SERVICES LLC, and BLACKSTONE OILFIELD SERVICES LLC and any other, as of yet, undiscovered company or LLC owned, operated or managed by JAMES TERRY HENRIKSON and/or SARAH CREVELING.

g.  Address and/or telephone books, rolodex indices, and any papers or correspondence, reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, financial institutions, and other individuals or businesses with whom a financial relationship exists with BLACKSTONE LLC, BLACKSTONE CRUDE LLC, BLACKSTONE BUILDING GROUP LLC, BLACKWELL SERVICES LLC, and BLACKSTONE OILFIELD SERVICES LLC

h.  Cellular telephones, smartphones, or any other mobile communication or digital data storage device for information related to the operation of Blackstone LLC, Blackstone Crude LLC, Blackstone Building Group LLC, Blackwell Services LLC, Blackstone Oilfield Services LLC and any other, as of yet, undiscovered company or LLC owned, operated or managed by JAMES TERRY HENRIKSON and/or SARAH CREVELING, and/or any alias or variation referenced in the affidavit such as JAMES TERRY HENRICKSON, JAMES TERRY HENDERSON, JAMES TERRY HENDRIKSEN, JAMES TERRY HENDRIKSON, JAMES TERRY HENRICKSEN, JAMES TERRY HENRIKSEN, COLE JOHNSON, and AMY

PETERSON.

i.   Cellular telephones, smartphones, or any other mobile communication or digital data storage device for information recording JAMES TERRY HENRIKSON'S or SARAH CREVELING'S schedule or travel from February 2011 to the present.

j.   Items that would tend to establish, and identify, ownership of the residence, vehicles, storage facilities, cellular phones, cellular phone services, or computers to include credit card bills, telephone bills, correspondence and other identification documents.

k.   Any and all US currency exceeding $1,000.

l.   Firearms and ammunition.

m.   Items that would tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.