IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 4:14-cr-010 |
| Plaintiff, | |
| v. | UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE |
| JAMES TERRY HENRIKSON, | |
| Defendant. | |

The United States of America, by Timothy Q. Purdon, United States Attorney for

the District of North Dakota, and Gary L. Delorme, Assistant United States Attorney,

hereby files this response resisting the Motion to Suppress Evidence filed on March 26,

2014, by defendant James Terry Henrikson.  Defendant seeks suppression of any and all

evidence seized from a safe found in his residence during a search conducted by law

enforcement on January 14, 2014, after the authorization of a valid search warrant.

FACTS

In approximately September 2013, federal law enforcement agents began

investigating bank, wire, and mail fraud allegations related to a company named

Blackstone LLC.  Blackstone LLC was a trucking company doing business primarily in

the Bakken oil fields in northwestern North Dakota and appeared to be owned, operated,

and managed by Sarah Creveling (hereinafter "Creveling") and her husband, James Terry

Henrikson (hereinafter "Henrikson").

The investigation was initiated based upon statements from various investors of

Blackstone LLC who reported that they were approached to invest in the LLC by

investing funds sufficient to purchase various trucks primarily used for hauling oil, water, and other chemicals needed for the production of oil.  In exchange for providing funds sufficient to purchase the trucks, the investors were promised a full return on their initial investment and a percentage of the profits generated by the particular truck that was purchased with their investment.  The investors generally received a full return on their initial investment, but did not receive their share of profits generated thereafter.  When the investors inquired as to why they were not receiving further profits, they were either told that the truck was losing money or that the truck was physically wrecked and no longer operable.  Some of the investors received fraudulent or false loss statements by mail supporting the claim that the truck was no longer profitable.

Based upon these allegations, as well as various other allegations being investigated by state and local authorities, the matter also came under investigation by agents from the United States Postal Inspection Service, Internal Revenue Service, Homeland Security Investigations, and were later joined by agents from the Bureau of Alcohol, Tobacco and Firearms and the Federal Bureau of Investigation.

The investigators, after identifying Creveling and Henrikson as the owners and operators of Blackstone LLC, ran standard criminal history checks and became aware of Henrikson's multiple prior felony convictions stemming out of conduct committed in Deschutes County, Oregon, and in Washington.  Later analysis of these prior convictions indicated that Henrikson was prohibited from possessing or controlling firearms.

During the investigation, still centering upon the fraud allegations, the investigators from the various agencies discovered that Creveling and Henrikson had created numerous other limited liability companies.  Further investigation indicated that ownership of many of the investor purchased trucks were either transferred outright to these other LLCs or the trucks were being operated under contracts that billed the accounts receivable to the other LLCs.  This resulted in the trucks reflecting a net operating loss to Blackstone LLC.  Investigators confirmed, either visually or via firsthand witness accounts, that these trucks were still operating and, in fact, were operating in what appeared to be a profitable manner.

During the investigation into the alleged fraud, the investigators received reports from witnesses that Henrikson was in possession of firearms.  Elliot Carney, who resided with Creveling and Henrikson for a period of time, indicated to investigators that Henrikson had a large gun safe located in his bedroom that contained numerous guns belonging to Henrikson and that Henrikson often slept with a gun.  (See ¶ 60 of Application and Affidavit in Support of Search Warrant).

Based upon the information and evidence gathered, investigators drafted an affidavit of probable cause requesting a search of the residence owned by Creveling and Henrikson for evidence related to the alleged fraud and possession of firearms by Henrikson.  The affidavit was presented to the federal Magistrate Judge located in Bismarck, North Dakota.  The Magistrate found probable cause to believe that the crimes of felon in possession of a firearm, money laundering, and mail and wire fraud had been

committed and that evidence of such crimes could be found at Creveling and Henrikson's residence.  Based on these findings, the Magistrate authorized a search warrant.  The search warrant, insofar as it is related to the money laundering and fraud, allowed the agents to search the entirety of the listed property for evidence of the fraud, including items that ranged from digital data storage devices that can be smaller than a postage stamp to business related records in any format.  The search warrant, insofar as it is related to the firearms, also allowed a search of the entirety of the residence, including the garage, any outbuildings, and any vehicles, for firearms and ammunition.  See Attachments A and B to Application and Affidavit for Search Warrant.

The search of the residence commenced on January 14, 2014.  The search warrant, based upon justifiable officer safety concerns, allowed for a no-knock entry to commence the search.  Agents, however, did not forcibly enter the residence as they were able to confirm that Henrikson was not present in the home at the time the search was to commence.  The agents methodically cleared the residence of hazards or threats of harm before actually searching the residence.  The search commenced immediately after the residence was cleared.

During the search the agents recovered approximately 20 boxes of documents, including billings, receipts and other business documents related to Blackstone LLC or the various other LLCs that were created by Creveling and Henrikson, and at least 20 digital data storage devices.  The agents also recovered seven (7) firearms and 1,188 rounds of various calibers of ammunition.  All of the firearms, as well as most of the

ammunition, were recovered from a large gun safe that was located in the master bedroom that belonged to Creveling and Henrikson. There was one loaded firearm magazine, however, found in the closet of the master bedroom.

The safe was closed and locked when the agents entered the residence. The agents, acting under authority of the search warrant allowing a full search of the residence and any containers therein, first contacted a locksmith to physically or mechanically provide entry into the safe, only to find that the nearest locksmith was over four (4) hours travel time to the residence. Had a locksmith been available, access to the safe via a locksmith would have resulted in either physical damage or destruction of the safe. The agents then contacted the manufacturer of the safe and received a copy of the factory set combination for the safe that allowed access to the gun safe without causing physical damage. The fact that the factory set combination still opened the safe indicated that the safe's combination had never been reset after the safe was purchased by Creveling or Henrikson.

In addition to the firearms and ammunition found inside the safe, the agents also recovered a passport in the name of Henrikson; a Texas State Identification card in the name of Henrikson; medical records in the name of Henrikson; court records for Henrikson; parole and probation cards with meeting times for Henrikson; other traffic and speeding citations for Henrikson; tax records for Henrikson; records for the Blackstone entities; investment records for the Kingdom Dynamics deal: provisional temporary travel permits for Henrikson to travel to North Dakota from Washington on

5

March 21, 2012; a cashier's check for Henrikson; court records from Deschutes County, Oregon; and probation records for Henrikson from Travis County, Texas.

Neither Creveling nor Henrikson were present during the search of the residence. Creveling did contact law enforcement several days after the search of the residence and indicated a willingness to talk with the agents.  Creveling, along with her attorney, met with agents in Minot, North Dakota, where she provided the following information:

- The handling of investors' trucks was fraudulent in the billing or the manner in which their ownership was transferred to Creveling and Henrikson's other LLCs;

- Investors were sent inaccurate profits and loss statements and that profits were routinely funneled to Creveling and Henrikson's other LLCs;

- All of the firearms found inside the gun safe belonged to Henrikson who, knowing he was a prohibited felon, would try to shield himself by having Creveling maintain the combination to the safe and open the safe whenever Henrikson wanted access to its contents;

- Creveling purchased a number of the guns in the safe at Henrikson's direction;

- Henrikson would often possess and fire some of the firearms;

-  Henrikson had instructed her to never admit that she was at a gun range shooting firearms with him;

- Henrikson would often, and meticulously, wipe down the firearms before placing them back in the safe after his possession or use; and

6

- The gun safe was purchased by both Creveling and Henrikson and that neither party changed the combination from the factory settings and that Henrikson knew the combination to the safe when it was purchased.

Kirby Voegele, owner of Big Boy's Toys gun store located in Watford City, North Dakota, was interviewed based upon information provided by Creveling. Voegele indicated to the agents that he did recall Creveling and Henrikson and knew that Creveling and Henrikson would often frequent the store together. Voegele recalled that Henrikson would point to the firearm he wanted telling Creveling "you want this one honey" and Creveling would then purchase the firearm in her name. Voegele recalled that Creveling and Henrikson purchased a Christensen, Model 1911, .45 caliber pistol on one occasion and that sometime after the purchase Henrikson, without Creveling present, returned the handgun to the store for repair. Voegele also recalled Creveling and Henrikson purchased a Kel-Tec, 12 gauge shotgun. Both the Christensen, Model 1911, .45 caliber handgun and the Kel-Tec, 12 gauge shotgun were found in the safe at the residence at the time of the search.

Ryan Olness, a former employee and investor in Blackstone LLC who had also previously lived with Creveling and Henrikson, indicated that he witnessed Henrikson in possession of many firearms and would at times meet Creveling and Henrikson at the gun range in Watford City. Olness recalled an occasion when one of his friends gave him an older style shotgun. Olness could not possess firearms so he approached Henrikson and asked if Henrikson would keep the shotgun. Henrikson agreed, took the shotgun and

indicated that he would put it in his gun safe. It should be noted that an older style Mossberg 12 gauge shotgun was also recovered from the safe found in Creveling and Henrikson's bedroom.

Finally, Peyton Martin, who was having an extramarital affair with Henrikson and is the biological mother of a child belonging to Henrikson, was interviewed in the presence of her counsel. Martin indicated that she was aware that Henrikson had a handgun in the center console of the pickup truck he was driving on one occasion when he picked her up.

Based upon Creveling's statement that Henrikson would meticulously wipe down the firearms before replacing them in the safe, the firearms, magazines and select ammunition were submitted to the North Dakota State Lab for analysis regarding whether any fingerprints could be recovered. That analysis failed to recover any fingerprints on the items submitted. This lack of any type of identifiable fingerprints corroborates the statements provided to law enforcement by Creveling that Henrikson would wipe down the guns after his use.

## ARGUMENT

**I.** **Evidence presented in the affidavit was sufficient for the Magistrate Judge to find probable cause that Henrikson was a felon in possession of a firearm and that evidence of this criminal conduct would be found in Henrikson's residence along with possible evidence of mail, wire, or bank fraud.**

Search warrant authority, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, allows a United States Magistrate Judge to issue a search warrant if there is

(1) evidence of a crime, (2) contraband, fruits of crime or other items illegally possessed, (3) property designed for use, intended for use, or used in committing a crime, or (4) a person to be arrested or a person who is unlawfully restrained.  Fed. R. Crim. P. 41(c). The granting of such search authority must be supported by probable cause.  United Stated v. Stevens, 530 F.3d 714, 717-718 (8th Cir. 2008).  "Probable cause means a 'fair probability that contraband or evidence of a crime will be found in a particular place,' given the circumstances set forth in the affidavit."  See United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999) (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)).  The property to be searched, including all buildings and containers contained thereon, which might contain items of the contraband being sought may be searched by law enforcement agents.  See United States v. Gamboa, 439 F.3d 796, 807 (8th Cir. 2006); see also United States v. Schmitz, 181 F.3d 981, 986-87 (8th Cir.1999).

Henrikson does not challenge the probable cause determination made by the Court in granting the agents search authority for the property.  It is undisputed that the search warrant affidavit provided the Court with sufficient indicia that the agents believed Henrikson had violated 18 U.S.C. § 922(g), better known as the prohibited felon in possession of a firearm.  It is further undisputed that the affidavit provided additional information indicating that the agents were aware of the fact that Henrikson had numerous prior qualifying felony convictions that prohibited Henrikson from possessing a firearm.  The affidavit also referenced firsthand witness knowledge that Henrikson possessed numerous firearms, firearms that were maintained in a gun safe located inside

his bedroom, and that Henrikson often slept with a firearm.  All of these facts, known at the time the search warrant application was presented to the Court, provided sufficient probable cause to believe Henrikson was a prohibited felon in possession of firearms and that there was a fair probability that the firearms would be found on the property to be searched.  Indeed, the firearms were found in the exact location as indicated by Carney.

"A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."  United States v. Ross, 456 U.S. 798, 820-21 (1982).  "Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found."  Id. at 821.  "A container that may conceal the object of a search authorized by a warrant may be opened immediately; the individual's interest in privacy must give way to the magistrate's official determination of probable cause."  Id. at 823.

As indicated above, lawful authority to search a property includes the lawful authority to search any buildings or containers contained on or within the property so long as the items sought could be found there.  The search warrant authority allowed for the search and seizure of any documentation related to the suspected fraud and any firearms and ammunition found within the property.  The scope of the search was therefore any area or container on the property that could contain the firearms and ammunition or evidence of any of the other suspected offenses.  Common sense would

dictate that one of the first places to be searched on the property for firearms and ammunition would be the gun safe, especially when the agents had direct information that the gun safe was where the firearms were kept.  Clearly, the affidavit and search warrant provided ample support for the Magistrate to find probable cause for seizure of any evidence to the alleged crimes, wherever they be found on the premises.

II.   **The search warrant authorized law enforcement agents to access any container on the premises, including the gun safe, by whatever means necessary.**

Henrikson's sole dispute with the search appears to be with the agents' access to the locked gun safe located within his bedroom.  Henrikson argues that he did not have personal access to the safe's combination and that the agents did not have authority to seek out the combination of the safe from the manufacturer.  As previously noted, a lawful search of fixed premises extends to the entire area in which the object of the search is likely to be found.  See Ross, 456 U.S. at 820.  Scenarios involving locked containers in other cases have been found valid without the need for a second warrant.

Citing the Ross case, the Eighth Circuit in United States v. Wright, 704 F.2d 420 (8th Cir. 1983), held that a warrant that authorized the search of a residence for drugs also permitted law enforcement to search a locked safe found in a bedroom.  Wright argued that the safe was not explicitly included in the search warrant and that he did not consent to the search.

11

These drugs obviously could fit within the safe and reasonably could be expected to be found in it.  Under these circumstances, the police officers did not exceed the scope of their warrant in searching the safe, and the seizure of the items contained in it thus was lawful.  Accord United States v. Newman, 685 F.2d 90, 92 (3rd Cir. 1982)  (when warrant authorized officers to search office for a shotgun, ammunition and documents, their search of a brief case found in office was lawful; but officers could not have lawfully searched the brief case if the warrant only authorized a search for a shotgun.)

Wright, 704 F.2d at 422-23 (emphasis added).

The Wright case also cited United States v. Morris, 647 F.2d 568 (5th Cir. 1981), where a defendant charged with bank robbery challenged introduction of money found in a locked jewelry box when a valid warrant had authorized the search of the residence. Morris argued that he had an expectation of privacy in the locked box and that a second search warrant should have been obtained.  Noting that no court has required a second, third, or fourth search warrant to validly search an area within the scope of an existing warrant, the Morris court held the evidence found in the locked box was admissible into evidence.  "It would be a different matter if the box had been in a geographic area not covered by the warrant or if the objects sought in the warrant were of a size that would not fit in the box."  Id. at 573.  Similarly, neither of these situations are present in Henrikson's case.

Likewise, a similar situation was found in United States v. Gonzalez, 940 F.2d 1413 (11th Cir. 1991).  In Gonzalez, a search of a house was found valid but the defendant challenged the search of a locked briefcase found in the house.  The home was being searched for documents relating to the illegal importation of controlled substances.

12

"Assuming without deciding that Gonzalez had a legitimate expectation of privacy in his locked briefcase, we hold that the valid search warrant for [the house] provided sufficient authorization for the search of the briefcase found in the house.  Id. at 1420 (citing Morris, 647 F.2d at 572-73).

"[W]e hold that a general consent to search a specific area for specific things includes consent to open locked containers that may contain the objects of the search, in the same manner that such locked containers would be subject to search pursuant to a valid warrant."  United States v. Martinez, 949 F.2d 1117, 1120 (11th Cir. 1992).  In Martinez, a defendant consented to the search of a warehouse unit but not to the locked trunk of an automobile located within the unit.   Several other published and unpublished cases have also held that locked containers found within the premises contained in a valid warrant can be searched without a subsequent warrant.  See United States v. Abrahams, 493 F.Supp. 310 (S.D.N.Y. 1980) (Second search warrant not necessary for locked safe and filing cabinet found within the property named in valid search warrant); United States v. Edwards, 2009 WL 2622091, No. 09-10845 (11th Cir. Aug. 27, 2009), (Search of a home with a warrant looking for firearms uncovered a locked safe containing drugs. The safe was large enough to hold a handgun so the safe was pried open by law enforcement.  Citing both the Gonzalez and Morris cases, the court found the officers were authorized to open the safe and seize its contents.); and United States v. Barron, 1993 WL 311982, No. 92-30259 (9th Cir. Aug. 17, 1993) (Law enforcement entitled to open safe that they found in a bedroom when executing search warrant; defendant

13

provided combination to agents who stated they would open the safe one way or another without the combination.  Defendant later challenged the introduction of the evidence. "Appellant's challenge must fail because even without the combination, officers were entitled to open the safe by other means."  Id. at *1.)

Generally speaking, when agents search a property and come upon a locked container they will seek the assistance of the property owner in gaining access to the container.  If the property owner is unavailable or refuses to provide the assistance needed to gain access, then the agents will gain entry forcibly if needed.  In this case, neither Creveling nor Henrikson were home during the search and obtaining a locksmith was prohibited by the time necessary for a locksmith to arrive on site.  Even if a locksmith could have been obtained, any procedure completed by the locksmith to gain entry would have resulted in damage to the safe.  The agents were left with two choices, both of which are permissible in an authorized search: (1) the agents could have procured a torch and gained entry by cutting the hinges on the safe's doors, or (2) the agents could seek the assistance of the safe's manufacturer, which is what occurred in this case.  Under either scenario, the agents would have gained entry into the safe.  Contacting the safe manufacturer for the combination was the least destructive method the agents could have chosen, even if other means would have been authorized.  Compare  United States v. Becker, 929 F.2d 442 (9th Cir. 1991) (Search found to not violate scope of warrant where agents used a jackhammer to search beneath a new concrete slab for evidence of drug offenses.  "It is plain that while the destruction of property in carrying out a search is not

favored, it does not necessarily violate the fourth amendment." Id. at 446 (internal citations omitted).

Likewise, the agents in this case had reliable testimony from witnesses that firearms were likely located in a gun safe in Henrikson's bedroom.  Given the options available, the agents opted to contact the safe's manufacturer.  The agents identified themselves to the manufacturer and explained that the safe in question was subject to a federal search warrant.  The manufacturer willingly agreed to provide the agents with the factory set combination for the safe.  The combination was entered by the agents and the agents were able to gain entry into the safe.

The notion that federal law enforcement agents must seek additional search warrants for every locked container on a property is absurd and not supported by any identifiable case law.  Law enforcement had probable cause and were authorized by the signed warrant to seize any property within the parameters of the warrant, including the opening of any closed containers.

<u>CONCLUSION</u>

The search warrant and accompanying affidavit provided sufficient evidence authorizing seizure of items that may be linked to the offenses set forth in the warrant including any items found in the locked safe.  Based upon the foregoing, the United

15

States respectfully requests that this Court deny Henrikson's Motion to Suppress

Evidence.

        Dated:  April 8, 2014.

                                      TIMOTHY Q. PURDON
                                      United States Attorney

                By:      */s/  Gary L. Delorme*
                                      GARY L. DELORME
                                      Assistant United States Attorney
                                      P. O. Box 699
                                      Bismarck, ND  58502-0699
                                      (701) 530-2420
                                      ND Bar Board ID No. 05845
                                      Gary.Delorme@usdoj.gov
                                      Attorney for United States

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

        v.

JAMES TERRY HENRIKSON,

               Defendant.

Case No. 4:14-cr-010

CERTIFICATE OF SERVICE

      I hereby certify that on April 8, 2014, the following document(s):

UNITED STATES' RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

was filed electronically with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) to the following:

      Mr. William Schmidt
      William_schmidt@fd.org

      I further certify that a copy of the foregoing documents will be mailed by first class mail, postage paid, to the following non-ECF participant(s):

Dated: April 8, 2014.

               /s/ Angel Pedersen
               ANGEL PEDERSEN
               Office of the United States Attorney